[Crim. No. 6304. Second Dist., Div. One. Feb. 15, 1960.]

THE PEOPLE, Appellant, v. HOWARD L. HOLTZEN-
DORFF, Respondent.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, William B. McKesson, District Attorney, Jere J. Sullivan and Harry Wood, Deputy District Attorneys, for Appellant.

Joseph A. Ball and Herman F. Selvin for Respondent.

BISHOP, J. pro tem.*—The People have appealed from the order granting defendant's motion to set aside the 52 count

*Assigned by Chairman of Judicial Council.

indictment that accused him of having committed as many felonies. We infer, from the comments made when the motion was granted, that it was made on the ground that the defendant had been indicted without reasonable or probable cause, a ground recognized for such a motion by section 995, Penal Code. We have concluded that for those counts which we shall identify as the ''even numbered counts,'' those charging the defendant with the embezzlement of public moneys, there was probable cause, and so we are reversing the order appealed from as it applies to them. We are affirming the order as to the remaining counts.

### Some General Principles

Several principles guide our thought. [■■ We find these statements in *Bompensiero* v. *Superior Court* (1955), 44 Cal. 2d 178, 183-184 [281 P.2d 250, 254] : ''Probable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused. *People* v. *Nagle,* 25 Cal.2d 216, 222 [153 P.2d 344]. An indictment will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it. *Lorenson* v. *Superior Court,* 35 Cal.2d 49, 56, 59 [216 P.2d 859] ; *cf. Greenberg* v. *Superior Court,* 19 Cal.2d 319, 322 [121 P.2d 713].'' No doubt the words ''an offense'' were not used to mean ''any offense,'' but ''an offense within the indictment.''

One of the questions confronting the Supreme Court, in the Bompensiero case, was whether the prosecution was barred by the statute of limitations. ■■ Ever since *People* v. *McGee* (1934), 1 Cal.2d 611, 613 [36 P.2d 378, 379], it has been the acknowledged law of this state that ''the statute is jurisdictional, and that an indictment or information which shows on its face that the prosecution is barred by limitations fails to state a public offense. . . . This is, of course, a rule essentially different from that governing civil actions. . . .'' Section 800, Penal Code, limits most felony prosecutions to three years. It provides that: ''An indictment for any other felony than murder, the embezzlement of public money . . . or the falsification of public records, must be found . . . within three years after its commission.'' ■■ Each count of the indictment and the evidence before the grand jury dealt with events that occurred more than 40 months before the grand jury found the indictment. As the indictment was not for murder or the acceptance of a bribe by a public official or

public employee, it came too late, except insofar as it charges the embezzlement of public money or the falsification of public records.

We shall have occasion to note the evidence with greater particularity before we have finished, but for the moment it suffices to say that it introduces the defendant as the Executive Director, Secretary and Treasurer of the Housing Authority of the City of Los Angeles (the "Authority," for the purpose of future references). He became interested in a political campaign, in the early part of 1953, and undertook to help in the campaign. Some 19 of the Authority's employees were persuaded to assist in his efforts, and some typewriters were rented for their use. The compensation of the employees, while busy in the campaign, and the rental for the typewriters, were paid by checks drawn on the Authority's bank account.

The counts of the indictment fall into three groups. But for changes in names, amounts and dates, the odd numbered among the first 42 counts, to be hereafter referred to as the "odd numbered counts," read as does Count I: "The said HOWARD L. HOLTZENDORFF is accused by the Grand Jury . . . of the crime of EMBEZZLEMENT OF PUBLIC MONEYS in Violation of Section 424 Subdivision 2, Penal Code . . . committed . . . as follows:

"That on or about the 18th day of March, 1953 . . . HOWARD L. HOLTZENDORFF, was an officer of the State of California, to wit, Executive Director, Secretary and Treasurer of the Housing Authority of the City of Los Angeles; that at said time and place, said defendant was charged with the receipt, safekeeping, transfer, and disbursement of public moneys of said Housing Authority of the City of Los Angeles; that at said time and place, said defendant was in receipt and in possession of $127.95 in public moneys of said Housing Authority of the City of Los Angeles; that at said time and place, said defendant did willfully, unlawfully and feloniously embezzle, and without authority of law, use said $127.95 in public moneys for a purpose not authorized by law, by making and issuing and causing to be made and issued, checks drawn on the payroll account of said Housing Authority of the City of Los Angeles, maintained at the Bank of America National Trust and Savings Association, payable to Audrey Aarhus, who was not entitled to receive said public moneys."

In the second group are the "even numbered" of the first 42 counts, of which the second count is typical:

## "Count II

"For a further and separate cause of action, being a different statement of the same offense alleged in Count I, hereof, the said HOWARD L. HOLTZENDORFF is accused . . . of the crime of EMBEZZLEMENT OF PUBLIC MONEYS in Violation of Section 504, Penal Code . . . committed . . . as follows:

"That on or about the 18th day of March, 1953 . . . HOWARD L. HOLTZENDORFF, was an officer and agent of a public corporation, to wit, the Housing Authority of the City of Los Angeles; that at said time and place said defendant had in his possession and under his control, by virtue of his trust as said officer and agent of said Housing Authority of the City of Los Angeles, $127.95 in public money, the property of said Housing Authority of the City of Los Angeles; that at said time and place, said defendant feloniously and fraudulently embezzled and appropriated said $127.95 in public moneys to a use and purpose not in the due and lawful execution of his trust as said officer and agent of said Housing Authority of the City of Los Angeles, by making and issuing and causing to be made and issued checks drawn on the payroll account of said Housing Authority of the City of Los Angeles, maintained at the Bank of America National Trust and Savings Association, payable to Audrey Aarhus, who was not entitled to receive said public moneys."

In the third group, the "last ten counts," charges are made of the falsification of public records, in violation of subdivision 3 of section 424.

### ODD NUMBERED COUNTS

Our first question is this: Do the odd numbered counts charge the embezzlement of public moneys? Its answer depends upon the interpretation to be placed upon subdivisions 1 and 2 of section 424, Penal Code, read together with sections 503 and 504 of the same code. In Section 424 we find: "Each officer of this State, or of any county, city, town, or district of this State, and every other person charged with the receipt, safekeeping, transfer, or disbursement of public moneys, who either: 1. Without authority of law, appropriates the same, or any portion thereof, to his own use, or to the use of another; or 2. . . . uses the same for any purpose not authorized by law; . . .

"Is punishable by imprisonment in the state prison for not less than one nor more than ten years . . ."

Section 503 simply states: "Embezzlement is the fraudulent appropriation of property by a person to whom it has been

intrusted.'' Section 504 is a bit more explicit: ''Every officer of this State, or of any county, city, city and county, or other municipal corporation or subdivision thereof, and every deputy, clerk, or servant of any such officer, and every officer, Director, Trustee, Clerk, servant, or agent of any association, society, or corporation (public or private) who fraudulently appropriates to any use or purpose not in the due and lawful execution of his trust, any property which he has in his possession or under his control by virtue of his trust, or secretes it with a fraudulent intent to appropriate it to such use or purposes, is guilty of embezzlement.''

We approach the task of interpreting section 424 with these words in mind, taken from *People* v. *Smith* (1955), 44 Cal.2d 77, 79 [279 P.2d 33, 34]: '' 'When language which is reasonably susceptible of two constructions is used in a penal law ordinarily that construction which is more favorable to the offender will be adopted.' *People* v. *Ralph,* 24 Cal.2d 575, 581 [150 P.2d 401, 404]; *People* v. *Valentine,* 28 Cal.2d 121, 143 [169 P.2d 1, 167 A.L.R. 675]. The defendant is entitled to the benefit of every reasonable doubt as to the true interpretation of words or the construction of language in a statute. [Citing cases.]'' See also *In re Tartar* (1959), 52 Cal.2d 250, 256-257 [339 P.2d 553, 556].

Applying these precepts, we conclude that a violation of either of the first two subdivisions of section 424 does not constitute embezzlement. In the first place, the code nowhere states that it is embezzlement. It is made a felony by the provision for imprisonment in the state prison (Pen. Code, § 17), but it is given no name. Then, as stated in *People* v. *Dillon* (1926), 199 Cal. 1, 7 [248 P. 230, 232], in which case the differences between the offense described in 504 and that of 424 were detailed: ''No one will deny the power or right of the legislature to provide that embezzlement of public moneys is committed by a public officer when he uses public funds in a manner forbidden by law, even though he may have no fraudulent intent when he does so.'' The fact remains that the Legislature has not done so, and ''fraudulently'' is made an essential element in both sections 503 and 504, which do define ''embezzlement.''

We are not unmindful of some instances where our appellate courts have spoken as though the felony of section 424 were embezzlement. In *People* v. *Griffin* (1959), 170 Cal.App.2d 358, 360 [338 P.2d 949, 950], the statement appears: ''Defendant was indicted, tried and convicted on three counts of em-

bezzlement of public money," and then goes on to discuss charges made under section 424. So far as disclosed by the opinion it made no difference, in the determination of the case, whether the offense was embezzlement or a felony without a name. We do not consider the opening characterization as a judicial attempt to label the crime created by section 424.

In *People* v. *Floyd* (1926), 78 Cal.App. 11, 20 [247 P. 917, 920], a 504 case, we find this puzzling sentence: "Embezzlement, whether charged under either section 424 or section 504 of the Penal Code, is 'the fraudulent appropriation of property by a person to whom it has been entrusted.' Section 503, Penal Code; *People* v. *Dillon*, 199 Cal. 1 [248 P. 230]." But, as we have seen, and as was pointed out in the Dillon case, and emphatically stated in *People* v. *Westlake* (1899), 124 Cal. 452, 454-457 [57 P. 465, 466-467], "fraudulently" is not an element of section 424, but it is an essential ingredient of section 504.

These words, found in *People* v. *Dillon, supra* (199 Cal. 6 [248 P. 231]), fit this case so aptly that we appropriate them; with respect to the odd numbered counts: "It is certain that the indictment was drawn under section 424, and no attempt was made to conform with the requirements of section 504." We do not overlook the presence, in each of the odd numbered counts, of the words "embezzlement" and "embezzle." Do these words import into each count the allegations that are missing to make it a count charging embezzlement? We think not. To take a far-fetched example, a charge that the defendant had feloniously stolen $250 from a passerby would not be converted into a charge of embezzlement by calling it that and adding that he had embezzled it. But if these words do have the magic of supplementing deficient embezzlement counts so that they are sufficient, then our odd numbered counts and our even numbered counts state identical offenses, and if we permit the order appealed from to survive this appeal, as to the odd numbered counts, the People will suffer no harm. If error there was, in the ruling, it was without prejudice.

■ There is an added reason why the counts, based on section 424, were found without reasonable or probable cause. Section 426, Penal Code, defines "public moneys" as those words are used throughout section 424, and the evidence in this case does not justify the conclusion that the moneys involved fall within the definition. "The phrase 'public moneys,'" section 426 declares, "as used in the two preceding

sections, includes all bonds and evidence of indebtedness, and all moneys belonging to the State, or any city, county, town, or district therein, and all moneys, bonds, and evidence of indebtedness received or held by State, county, district, city, or town officers in their official capacity.'' As we shall see, the defendant was probably an officer, certainly an agent, of a public corporation, and the money that he appropriated was public money, as the words are used in section 800. But he was not an officer of the state or of any county, district, city or town, nor did the money here involved belong to the state or to any of the other state subdivisions listed in section 426. The public character of the Authority is not to be denied; it is abundantly certified in *Housing Authority* v. *Dockweiler* (1939), 14 Cal.2d 437 [94 P.2d 794]. But it is not to question the right of the Authority to condemn land for its purposes, to hold its property tax free, to be supported by public money, and to claim exemption from income and franchise taxes, to conclude that, a public agency though it is, it is not the State, nor a county, city, town or district. The Legislature, in adopting the definition it gave in section 426 for the use of the words in section 424, might have included moneys belonging to or officers of a public corporation, but it did not. The moneys and the officers of the Authority are not governed by section 424, Penal Code.

### LAST 10 COUNTS

 There is a further consequence of this conclusion: there was no reasonable or probable cause for Counts 43-52 of the indictment. Each of these last 10 counts undertook to charge a violation of subdivision 3 of section 424, which, repeating its introductory paragraph, reads: ''Each officer of this State, or of any county, city, town or district of this State, and every other person charged with the receipt, safe-keeping, transfer, or disbursement of public moneys, who . . . 3. Knowingly keeps any false account, or makes any false entry or erasure in any account of or relative to the same . . .'' is guilty of a felony. In each of the last 10 counts the defendant was said to have knowingly made false entries in and to have kept a false account ''relating to the receipt, safekeeping, transfer and disbursement of public money owned by the Housing Authority of the City of Los Angeles.'' Each count goes on to specify that the false account was a payroll certificate showing a named employee to have been on vacation. As there is no other code section that makes the entry of a false

entry or the keeping of a false account *re* public moneys a felony, and section 424 does not apply to an officer of the Authority, or to the money of the Authority, the evidence before the grand jury did not warrant any one of the last 10 counts of the indictment.

### EVEN NUMBERED COUNTS, 2-42

The even numbered counts that pair with the odd numbered ones that we have considered, plainly charge violations of section 504, Penal Code, and so embezzlement. If that alleged to have been fraudulently appropriated was public money, these even numbered counts are subject to no statute of limitations. With respect to these counts the questions we have to answer, are these: Was there evidence before the grand jury that found our indictment, that "would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion," (to repeat the apt words from a quotation in *Lorenson* v. *Superior Court* (1950), 35 Cal.2d 49, 57 [216 P.2d 859, 863-864]) that: (a) the Housing Authority of the City of Los Angeles was a public corporation; (b) the defendant was either an officer or an agent of the Authority during the year 1953; (c) public moneys had been entrusted to the defendant as such officer or agent, which, in 1953, he had in his possession or under his control; and (d) the defendant fraudulently appropriated the sums to uses or purposes not in the due and lawful execution of his trust, by causing checks to be drawn on an account of the Authority in favor of persons not entitled to receive the proceeds? As already indicated, we find that there was such evidence as to each of the listed propositions.

(a) *The Authority is a public corporation.*

There is no room for doubt concerning the status of the Housing Authority of the City of Los Angeles. Section 34203 of the Health and Safety Code says: " 'Authority' means a public corporation created pursuant to this chapter." Section 34240 of the same code declares: "In each county and city there is a public body corporate and politic known as the housing authority of the county or city." In *Housing Authority of City of Los Angeles* v. *City of Los Angeles* (1952), 38 Cal.2d 853, 861 [243 P.2d 515, 519], we find this use made of the sentence just quoted from section 34240: "The housing authority was thereby created as a state agency, 'a public body corporate and politic,' and is not an agent of the city in which it functions." Further quotations could be added

from the cases, but our last quotation will be from section 34310 of the Health and Safety Code: "An authority constitutes a corporate and politic public body."

(b) *The defendant was an officer or agent of the Authority.*

Section 34278 of the Health and Safety Code, authorizes the authority to "employ a secretary, . . . who shall be executive director, technical experts, and such other officers, agents and employees as it requires, and shall determine their qualifications, duties and compensation." Section 34280 adds: "An authority may delegate to one or more of its agents or employees the powers or duties it deems proper." In its by-laws (Exhibit 43, before the grand jury, was a copy) the Authority provided that among its *officers* should be a secretary, who should be the Executive Director of the Authority. It was specifically provided that, as Executive Director, "he shall have general supervision over the administration of its business and affairs." It was further provided that "The Secretary shall also be the Treasurer of the Authority. . . . As Treasurer he shall cause to be deposited all monies and other valuables in the name and to the credit of the Authority with such depositaries as may be designated by the Commissioners. He may disburse the funds of the Authority as may be ordered or authorized by the Commissioners. . . ."

The evidence before the grand jurors amply supported their presumed conclusion that the defendant, during the first half of the year 1953 (and more) was the Secretary, Executive Director and Treasurer of the Authority. Mr. Beavers, the acting chairman of the Commission of the Authority, in 1953, who had been a commissioner for about 11 years at the time of his testimony, in April of 1958, testified that the defendant had been the executive director of the Authority during all the time he was commissioner. Exhibit 56 is a writing signed by the defendant and Mr. Beavers, who had become active chairman of the Authority, in which it is recited that the defendant had continuously served the Authority from 1951 to 1956 "in the capacity of Secretary, Executive Director and Treasurer."

We need not concern ourselves overmuch with the contention that the defendant was an employee, not an officer, of the Authority. There are cases, which we shall not review here, that draw a line of distinction which would justify the determination that he was an employee, not an officer. On the other hand there is the case of *People* v. *Schoeller* (1950), 96 Cal. App.2d 61, 63 [214 P.2d 565, 567] dealing with "officer" as used in section 424, Penal Code, which determines, as we

might well determine here: "Since it is the duty of the board to manage and conduct the business and affairs of the district . . . the secretary to whom certain of its duties are delegated would be not a mere employee but an officer of the district." See also *People* v. *Tennant* (1939), 32 Cal.App.2d 1 [88 P.2d 937], and *Bennett* v. *Superior Court* (1955), 131 Cal.App.2d 841, 843-844 [281 P.2d 285, 286-287].

Whether or not an officer, the defendant was undoubtedly an "agent" of the Authority, within the purview of section 504, Penal Code, and as such he was charged in the even numbered counts. In *People* v. *Foss* (1936), 7 Cal.2d 669, 670 [62 P.2d 372, 373], our Supreme Court made use of the definition of "agent," given by section 2295 of the Civil Code, as "one who represents another, called the principal, in dealing with third persons," and stated that the defendant fell within the definition and "was guilty of embezzlement as defined in sections 503 and 504 of the Penal Code." As we shall have occasion to note, before too long, the defendant was the representative, both of the commissioners and the Authority in dealing with many "third persons."

We quote from one further case respecting defendant's status as an agent of the Authority, that of *Maurice L. Bein, Inc.* v. *Housing Authority* (1958), 157 Cal.App.2d 670, 680 [321 P.2d 753, 759]: "It is urged the court erred in ruling that the executive director of Housing Authority was its agent for the purposes of the contract. We find no error. It was conceded below that the executive director was the person who carried on the day-to-day operations as the responsible head of Housing Authority." The Housing Authority referred to was the Authority with whom we are concerned; its executive director was the defendant. To be sure, we may not rely upon concessions made below in that case, nor upon its evidence. But in the evidence before the grand jury it appeared that the commission met regularly bimonthly; the executive director was the person who carried on the day-to-day operations of the Authority. He was an agent of that public corporation.

(c) *Public moneys were entrusted to the defendant and were in his control.*

■ Our conclusion, that the evidence warranted the grand jury in believing and entertaining a strong suspicion that the words of our subheading were true, is reached without giving those words either an unauthorized or strained construction.

The Authority's controller testified that during the early months of 1953 the Authority had a Payroll Revolving Fund account in the Bank of America, into which the rental money received from the tenants was deposited, and upon which all pay checks were drawn by a protectograph signature machine which made use of the authorized signatures of the defendant, the signer, and the witness cosigner. There were in evidence many checks drawn on this payroll account, dated in February and March, 1953, each bearing the protectograph signatures of the defendant and of the controller. Exhibit 37 consists of copies of several documents and a resolution presented by the defendant to and adopted by the commissioners of the Authority, approving the use of the protectograph in the payment of payroll checks, and a letter from the defendant to the Bank of America enclosing certificates, signed by him as secretary, respecting the matter. As we have seen, under the by-laws, the defendant, as treasurer, was to cause· all monies to be deposited in the name and to the credit of the Authority. According to the testimony of Mr. Beavers, the defendant was the one responsible for putting the rental money in the bank. From this, and other evidence that could be added, it is apparent that the monies out of which the employees of the Authority were paid were entrusted to and subject to defendant's control. To be sure, when the checks were drawn, the money was actually in possession of the bank, but, as stated by this court in *People* v. *Hess* (1951), 104 Cal.App.2d 642, 672 [234 P.2d 65, 85], and reiterated in *People* v. *Hess* (1951), 107 Cal.App.2d 407, 421-422 [237 P.2d 568, 577] : ''To constitute embezzlement it is not necessary to show actual possession of the money or property. It is sufficient to show that while an accused was not in actual possession of the money it was under his control in the sense that it was under his direction and management. *People* v. *Knott*, 15 Cal.2d 628, 631 [104 P.2d 33, 128 A.L.R. 1367].'' See, much to the same effect, *People* v. *Schmidt* (1957), 147 Cal.App.2d 222, 225 [305 P.2d 215, 219].

 That which is the subject of embezzlement, under either section 503 or 504, is ''property.'' Money is property (Pen. Code, § 7, subd. 12), and that was the property involved in these charges. In view of the disposition that we have made of the counts alleging offenses charged to be violations of subdivision 2 of section 424, Penal Code, we need not, at this point, determine whether the money involved was public money, within the limited definition of section 426, Penal Code. It

was, beyond a doubt, money of the Authority, however, and hence public money, for although the Authority is not the State, or any city, county, town or district therein, it is, as we have seen, a public corporation. Moreover, as pointed out in *Housing Authority* v. *Dockweiler* (1939), *supra,* 14 Cal.2d 437, 449 [94 P.2d 794, 801] an affirmative answer is to be given to the question ''whether slum clearance and public housing projects for low-income families are public uses for which public moneys may be expended and private property acquired.'' The opinion contains too many pertinent passages for us to begin to quote them here. We entertain no doubt that the money in the account of the Authority upon which the checks were drawn that operated to withdraw sums from the account and put money in the pockets of those named in each of the even numbered counts 20-42, was public money within the purview of section 800, Penal Code.

We do confess to a haunting suspicion that the Legislature, in referring to the ''embezzlement of public moneys'' in section 800 of the Penal Code, may have thought that it was referring to the crime created by subsection 2 of section 424, and not to that defined either generally, in section 503, or, more specifically, in section 504. After weighing the matter we have concluded that our suspicion remains just that; our conclusion is that a violation of section 424 is not the embezzlement of public moneys, as limited by the definition of section 426; a violation of section 504 is the embezzlement of public moneys, in those cases where public moneys, even those not falling within the 426 description, are involved.

(d) *The defendant fraudulently appropriated the public money entrusted to him.*

We have one more question to answer: Was the evidence before the grand jurors such that they were warranted in believing, and conscientiously entertaining a strong suspicion, that the defendant had fraudulently appropriated these public funds that had been entrusted to him to a use or purpose not in the due or lawful execution of his trust, as alleged in the even numbered counts? In the paragraphs immediately to follow we shall undertake to paint the picture that the grand jurors had before them, a picture that warrants an affirmative answer to the question just asked: there was sufficient evidence; and its sufficiency was not rendered insufficient by the screen that was drawn over it.

The defendant had, during the first half of 1953, three

lieutenants working directly under him: Jess M. Swanson, an administrative officer of the Authority; Roy L. Patterson, in general charge of the entire operative field, with some 500 subordinates; and Edward Lybeck, special assistant to the defendant. About the middle of February (all events narrated occurred in 1953), the defendant, speaking at a general staff meeting, emphasized his, and their, interest in the city campaign for Mayor, then under way, and advised that those present would have to take up their belts and roll up their sleeves in behalf of the incumbent. Again, just about a week later, the defendant reported to the three lieutenants named above (with possibly others present), that it had been agreed, at a meeting of the incumbent's campaign committee, that "we have a very simple mission to perform" which was to "produce sufficient gummed labels to mail one document to every registered voter." The defendant was reported to have said, further: "It was agreed that the gummed labels would be produced on Authority time." "Is that what Mr. Holtzendorff said in substance?" "In substance, this is exactly what he said."

Steps were immediately taken to carry out this agreement. The defendant put Patterson in charge of "manpower," and "other people" were advised that he (Patterson) "would be calling upon them for manpower and that they were to make their employees available to him to the degree to which they could . . . they were only to carry out those things that were absolutely necessary." The defendant concurred in the proposal to use an abandoned housing project, Corregidor Park, for the actual typing operation, and called up the purchasing agent and specifically authorized him to proceed with the rental of typewriters.

The plans then outlined by the defendant were carried into effect. Gummed labels were obtained from the printer; they and typewriters were taken to Corregidor Park, where a number of employees of the Authority gathered as directed and spent at least one work day there in typing names of voters. So large a number of girls working at the abandoned site was thought to attract too much attention, so the defendant discussed the situation with his three lieutenants, and the decision was reached to request the girls doing the typing to carry on with it at their homes. This was done, and for periods varying from less than a week to three weeks, the girls, working, singly or in groups, continued to do this campaign typing in private residences. Ed Lybeck picked up the lists of voters and saw

that they reached the girls. Patterson was busy at the task, here and there.

Sometime, early in March, an anonymous letter was written to the incumbent candidate, advising him of what was going on. A copy of the letter reached the defendant within a week, and again he and at least two of his lieutenants, met ''to decide what to do about it.'' The solution was quickly reached. ''Holtzendorff just told us plain and simple that everybody that was working on the campaign was to be placed on vacation; that leave slips were to be secured from everyone that was on the campaign.'' ''Put the people on annual leave, get leave slips from them, no ifs and/or buts about it.'' To Swanson's protest and question: ''Well, how is this vacation going to be restored?'' in essence, defendant's reply was: ''We'll worry about that later.''

As we undertook to test the sufficiency of the evidence with respect to each even numbered count, we did so knowing that the evidence, to be sufficient, does not have to match the allegations of the count exactly, either as to the time therein set forth or as to the amount received. We find our Supreme Court, in *People* v. *Smith* (1958), 50 Cal.2d 149, 152 [323 P.2d 435], quoting from one of its earlier cases: ''In *People* v. *LaMarr*, 20 Cal.2d 705, 711 [128 P.2d 345, 348], this court stated: 'An immaterial variance should be disregarded. (14 Cal.Jur. 96; *People* v. *Mizer* (1940), 37 Cal.App. 2d 148, 153-154 [99 P.2d 333].) The test of the materiality of a variance is whether the indictment or information so fully and correctly informs the defendant of the criminal act with which he is charged that, taking into consideration the proof which is introduced against him, he is not misled in making his defense, or placed in danger of being twice put in jeopardy for the same offense.' '' With respect to the question of double jeopardy, the Supreme Court continued: ''Nor is [the defendant] in danger of being placed in double jeopardy, for it is 'well settled that on a plea of double jeopardy, extrinsic evidence is admissible on the trial to identify the crime of which a defendant has been convicted.' *People* v. *Williams*, 27 Cal.2d 220, 226 [163 P.2d 692, 695].'' If, at the trial that may follow, the evidence is the same as that received by the grand jury, and a conviction follows, certainly so far as any time variance is concerned, there is no danger of the defendant being prejudiced, in view of the holding in *People* v. *Bechtel* (1953), 41 Cal.2d 441, 445 [260 P.2d 31, 34].

We have considered this matter of a possible variance, not

because we are convinced that it arises in a review of an order under section 995, but because we are convinced that even if it is a live question, its correct answer is of no help to the defendant.

▮▮▮▮▮ Dealing now with the sufficiency of the evidence as to each of the even numbered counts, we have discovered that each person alleged to have received money of the Authority, in all the even numbered counts, save Count 42, appeared as a witness before the grand jury. Each testified to having worked, as directed, typing names and addresses on the labels, for periods of from near one to three weeks (four to 15 days); and all but one testified that full compensation had been received from the Authority covering the period so employed.

The one exception was the recipient named in Count 10; but this count is supported by Swanson's testimony. About the middle of March the employee quit to get married, and was uncertain about being paid for the days she had typed. Swanson testified that she was paid as though on vacation for 96 hours (12 days) during which she typed. The defendant "made the decision at that time to place her on compensatory leave, to give her the amount as a part of her final settlement, the amount of money, the total hours that she had expended in the . . . campaign." He said: "Well, we can't take any chances on this girl going sour."

Count 42 deals with the rental of typewriters, the amount involved being $103. The grand jurors were told that some 20 typewriters were picked up from the Royal Typewriter Co., delivered to Corregidor Park, and later returned to the Royal Typewriter Co. A check for $511.93 paid for the rental—$100 plus $3.00 sales tax—and some other items with which we are not concerned.

### In Conclusion

If and when this case comes to be tried, the trial jury may be persuaded to entertain a reasonable doubt; maybe these recipients of their usual pay, or some of them, really took the vacations, some coming to them, others not due but advanced, in order that they could spend them typing gummed labels eight hours a day for days at a time. That remote possibility does not justify us in saying that the record before the grand jurors did not give them reasonable and probable cause to return each one of the even numbered counts. The vacation slips, the grand jurors could well have said, were meant to be

and were only effective as paper vacations; in no accepted meaning were these employees of the Authority on vacation. The defendant argues that if anything was taken from the Authority it was services, not money. But the services of these typing employees was not a commodity paid for and received and then diverted from its authorized purpose. It was the Authority's money that was appropriated and it went for services already rendered, but not to the Authority, nor for any use or purpose in the lawful execution of defendant's trust. As to the typewriter rental, not even the gossamer veil of a vacation was drawn in an endeavor to conceal what was actually done with respect to it.

Lastly, there was reasonable and probable cause to charge that the defendant had *fraudulently* appropriated the money. As stated in *People* v. *Talbot* (1934), 220 Cal. 3, 15 [28 P.2d 1057, 1061-1062] : ''In the case of *People* v. *Gordon,* 133 Cal. 328 [65 P. 746, 747, 85 Am.St.Rep. 174], speaking of our Code definition of embezzlement the court says : 'The essential elements of embezzlement are the fiduciary relation arising where one entrusts property to another, and the fraudulent appropriation of the property by the latter.' There would seem to be no hidden meaning in the use of the word in such definition. . . . One of the definitions of 'fraud' given by the Standard Dictionary is : 'Any act . . . that involves a breach of duty, trust, or confidence, and which is injurious to another, . . . and an act is declared to be fraudulent that is characterized by fraud.' '' We add these pertinent words, taken from *People* v. *Pierce* (1952), 110 Cal.App.2d 598, 609-610 [243 P.2d 585, 592], both for their statement of principle and for the line of reasoning embodied in them : ''Any diversion of funds held in trust constitutes embezzlement whether there is direct personal benefit or not as long as the owner is deprived of his money. (*People* v. *Talbot,* 220 Cal. 3 [28 P.2d 1057] ; *People* v. *Braiker,* 61 Cal.App.2d 406 [143 P.2d 89].) There is ample evidence to support the implied finding that defendants acted fraudulently in diverting these trust funds to the general promotion of their Gypsum venture. They were the persons principally interested in Gypsum, Inc., and were in charge of its management and policies ; . . . they deliberately used these trust funds . . . and they did the various acts knowingly and voluntarily.''

## OUR JUDGMENT

We are, therefore, reversing the order appealed from insofar as it set aside Counts 2, 4, 6, 8, 10, 12, 14, 16, 18, 20,

22, 24, 26, 28, 30, 32, 34, 36, 38, 40 and 42, of the indictment. The order is affirmed as to all the remaining counts.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied March 9, 1960, and respondent's petition for a hearing by the Supreme Court was denied April 13, 1960.