[No. F018554. Fifth Dist. Oct. 29, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDRES C. REDONDO, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1 this opinion is certified for publication with the exception of part I.

**COUNSEL**

Rodney Richard Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General,

Clayton S. Tanaka and David A. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**VARTABEDIAN, J.**—Defendant, Andres C. Redondo, was a deputy sheriff for the Merced County Sheriff's Department. He was convicted of felony embezzlement (Pen. Code, § 504)[1] and misdemeanor theft (§ 488). These charges arose when defendant used his assigned sheriff's department vehicle to steal a lawnmower. Defendant appeals, claiming opinion testimony was improperly admitted and asserting that his felony embezzlement conviction could not properly be based on his "momentary" usage of his patrol vehicle to steal the lawnmower. In the unpublished portion of our opinion, we reject the first claim. In our published discussion, we validate the embezzlement conviction, finding, however, the evidence supported a misdemeanor rather than a felony embezzlement.

### FACTS

In the early morning hours of July 14, 1991, Merced Police Sergeant Wallace L. Broughton was patrolling an area of commercial buildings when he saw a sheriff's department car backed up to the Small Engine Doctor repair shop. He saw defendant standing behind the vehicle and saw the handle of a lawnmower sticking out the driver's side of the trunk. It looked as if defendant was tying the trunk down. Sergeant Broughton recognized defendant, having known him for 10 years. Since a burglar alarm had gone off earlier in the area, Broughton thought defendant had caught a burglar. Broughton turned his car around to come back and talk to defendant.

Defendant was leaving the area when Broughton came back. Defendant took off speeding and Broughton pursued. He lost track of defendant and then saw headlights leaving an orchard. Broughton stopped defendant at 3:24 a.m. and asked him if he stole a lawnmower. Defendant denied all knowledge of the lawnmower and said he was on his way to a call at the hospital. The lawnmower was not in defendant's car when Broughton stopped him. He allowed defendant to leave.

Broughton called the chief of police. He and other officers found the lawnmower in an orchard later that morning. The lawnmower was one being repaired at the engine repair shop. The owner of the shop had left it outside the night before on the washpad.

---

[1]All further section references will be to the Penal Code unless otherwise noted.

The tread on the tires of defendant's car matched the tire tracks in the orchard where the lawnmower was found and the tire tracks at the engine repair shop. Dirt and paint chips were removed from the trunk of defendant's car. A comparison of dirt from the engine repair shop and the items removed from defendant's trunk were consistent with the mower having been in the trunk of defendant's car.

The vehicle driven by defendant was assigned to him by the Merced County Sheriff's Department. It was owned by the county and had a salvage value of $1,000.

*Defense*

Defendant testified that he received a call at home directing him to go to Merced Community Medical Center (MCMC) to interview a rape victim who was en route to the hospital. He left his home about 2:54 a.m. He arrived at MCMC and took a walk though the emergency room. When he did not see the victim, he left. He drove to Planada to look for a suspect in another case he was investigating. After doing this he started to drive back to MCMC. He stopped on the side of the road to urinate. He returned to his car and drove away. Shortly thereafter he was stopped by Sergeant Broughton. He then went to MCMC and interviewed the rape victim. He talked to the victim several times. Defendant testified he was not at the engine repair shop on July 14 and did not steal a lawnmower.

Defendant had several witnesses testify regarding the lighting at the engine shop to show that it would have been very difficult for Sergeant Broughton to identify anyone on July 14. In addition, defendant had several witnesses testify to his reputation for honesty and truthfulness in the community.

*Rebuttal*

The rape victim testified she checked into MCMC about 3 o'clock. She spoke to defendant once later in the morning. The patient registration clerk at MCMC clocked the victim in at 2:59 a.m. She saw defendant arrive around 3:45 p.m.

Jerry Brockman, an undersheriff at Merced County Sheriff's Department, testified. He stated that he did not believe defendant was honest. Prior to July 13, 1991, Brockman thought defendant was honest.

DISCUSSION

I.*

*Rebuttal Impeachment Testimony*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II.

*Temporary Use of Governmental Property*

Defendant's conviction under section 504 was based on his fraudulent appropriation of his official vehicle to steal the lawnmower. Section 504 provides: "Every officer of this state, or of any county, city, city and county, or other municipal corporation or subdivision thereof, and every deputy, clerk, or servant of any such officer, and every officer, director, trustee, clerk, servant, or agent of any association, society, or corporation (public or private), who fraudulently appropriates to any use or purpose not in the due and lawful execution of his trust, any property which he has in his possession or under his control by virtue of his trust, or secretes it with a fraudulent intent to appropriate it to such use or purpose, is guilty of embezzlement."

█ Defendant argues that his use of the vehicle was purely incidental to the target offense and such momentary use of property cannot constitute embezzlement of the property. Defendant contends that in order for the taking to be a violation of section 504, it must be made with the intent to permanently deprive the owner of the property for at least an extended period of time.

In order to prove a violation of section 504, it must be shown that the defendant "is (1) an officer of a city or other municipal corporation or subdivision thereof or a deputy, clerk, or servant of such an officer (2) who fraudulently appropriated property in his possession and control entrusted to him for a use or purpose not in a lawful execution of that trust. These elements 'may be proved by circumstantial evidence and reasonable inferences drawn from such evidence.'" (*People* v. *Schramling* (1987) 192 Cal.App.3d 989, 993 [238 Cal.Rptr. 8].)

*People* v. *Harby* (1942) 51 Cal.App.2d 759 [125 P.2d 874] is most closely on point to the facts presented here. In *Harby*, a city councilperson used a

---

*See footnote, *ante*, page 1428.

city-owned automobile to travel more than 4,000 miles on a pleasure trip. He was charged with willful or corrupt misconduct in office in violation of section 504 and Los Angeles Municipal Code section 63.106. The appellate court found the defendant had embezzled property from the city. "To drive a city-owned automobile on a 4,000 mile pleasure jaunt was so clearly an appropriation of the vehicle to a private use that illustration and authority seem supererogatory. His only right to the Chrysler was to use it in performing the city's business." (51 Cal.App.2d at p. 770.) "Such a journey without authorization required a use of the car that was inconsistent with its owner's rights and inconsistent with the nature of the trust reposed in appellant and therefore it was an embezzlement." (*Id.* at p. 771.) The appellate court commented that "a journey subjected the automobile to substantial detriment. It was therefore to the extent of its use an embezzlement of the property of the city." (*Id.* at p. 772.)

Although defendant's journey here was substantially briefer than the defendant's journey in *Harby*, his use was without authorization and was clearly inconsistent with the owner's rights and inconsistent with the nature of the trust reposed in defendant. Defendant not only used the automobile to steal the lawnmower, but used it to evade Sergeant Broughton at high speeds. By doing so, he subjected the automobile to detriment.

In *People* v. *Dolbeer* (1963) 214 Cal.App.2d 619 [29 Cal.Rptr. 573], the defendant enlisted the aid of a phone company employee to provide him with a daily list of new phone company subscribers. After defendant was given the list, he quickly copied and returned them to the employee. (*Id.* at pp. 621-622.) The appellate court found the lists were property because they were physical goods and had a value. (*Id.* at pp. 622-623.) The appellate court also found that, even though the lists were returned promptly, an embezzlement had occurred and the defendant appropriated the lists with the intent to defraud. (*Id.* at p. 625.)

Here, defendant's use of the vehicle was for a very brief period of time, but defendant appropriated the property to a purpose not in the due and lawful execution of his trust. Section 504 defines a violation in broad terms as "*any* use or purpose not in the due and lawful execution of his trust." (Italics added.) Defendant's utilization of the car, although brief, was an appropriation not in the public interest. (See *People* v. *Nathanson* (1955) 134 Cal.App.2d 43, 47 [284 P.2d 975].)

III.

*Felony or Misdemeanor Embezzlement*

Section 514 defines the punishment for one convicted of embezzlement. It provides: "Every person guilty of embezzlement is punishable in the manner prescribed for theft of property of the value or kind embezzled; and where the property embezzled is an evidence of debt or right of action, the sum due upon it or secured to be paid by it must be taken as its value; if the embezzlement or defalcation is of the public funds of the United States, or of this state, or of any county or municipality within this state, the offense is a felony, and is punishable by imprisonment in the state prison; and the person so convicted is ineligible thereafter to any office of honor, trust, or profit in this state."

The following stipulation was entered into by the parties: "Mr. Redondo was at the time of this offense, a Detective of the Merced sheriff's department, that he was a deputy of Sheriff Sawyer who's an officer of this county, that the vehicle that he was driving was the assigned—his assigned vehicle, and it was the property of this county, and that the value of that vehicle was approximately a thousand dollars, which is based upon a salvage value from the county persons who keep track of that."

■ Defendant asserts that the amount of the theft should be limited to the reasonable value of the temporary use of the vehicle between 3 and 6 a.m. Defendant argues that such use was less than $400, the amount necessary to prove grand theft, and therefore his conviction should be reduced to a misdemeanor. Defendant made the same argument at sentencing, and the court rejected it.

The People do not argue that defendant embezzled the stipulated value of the vehicle. The People contend that because the vehicle was bought, and the expenses to run the vehicle were paid, with public funds, defendant embezzled public funds. Pursuant to section 514 such embezzlement is a felony, regardless of the value of the property embezzled.

The term "public funds" is not defined in section 514. Section 424 lists particular crimes against government officials "charged with the receipt, safekeeping, transfer or disbursement of public moneys." Section 426 defines public moneys as follows: "The phrase 'public moneys,' as used in Sections 424 and 425, includes all bonds and evidence of indebtedness, and

all moneys belonging to the state, or any city, county, town, district, or public agency therein, and all moneys, bonds, and evidences of indebtedness received or held by state, county, district, city, town, or public agency officers in their official capacity."

The statute defining "public moneys" was enacted in 1872. The term "public funds" was inserted in section 514 in 1880. Whether the terms were intended to have the same or similar meanings is unclear. The term "public funds" has never been specifically defined in case law as it relates to section 514.

In determining the meaning of public funds contained in Labor Code section 1720, the court in *McIntosh* v. *Aubry* (1993) 14 Cal.App.4th 1576 [18 Cal.Rptr.2d 680] found that the county's right to charge rent was not a payment from public funds because it is not an available pecuniary resource like cash or some readily cash-convertible asset. The appellate court relied on the definition of "funds" found in *Keene* v. *Keene* (1962) 57 Cal.2d 657 [21 Cal.Rptr. 593, 371 P.2d 329]. (*McIntosh, supra,* at p. 1588.)

In *Keene* v. *Keene, supra,* 57 Cal.2d 657, the California Supreme Court discussed funds in the context of a divorce action: "When a word is used which has a well-established meaning in common parlance—such as 'funds'—the necessities of intelligible communication require that it be assumed that the user intended that common meaning. There is no mystery surrounding the word here questioned by plaintiff. The dictionary defines it as 'available pecuniary resources ordinarily including cash and negotiable paper' [citation], and in a legal context the courts have also taken it to include property of value which may be converted into cash [citations]." (*Keene* v. *Keene, supra,* 57 Cal.2d at p. 663.)

*California G. & E. Corp.* v. *Union Trust Co.* (1918) 178 Cal. 65 [172 P. 146] was one case cited in *Keene.* In that case the court was discussing "fund" in the context of a sinking fund: "The very idea of a 'fund' involves a concept of a sum of money maintained in existence for some purpose—a supply hoarded and kept to be called on when needed. For example, we might cite the definition of a 'fund' contained in the Century Dictionary and quoted by respondent as follows: " 'A stock or accumulation of money or other forms of wealth devoted to or available for some purpose, as for the carrying on of some business or enterprise, or for the support and maintenance of an institution, a family, or a person: as, a sinking-*fund*; the *funds* of a bank or corporation; the Widows' and Orphans' *Fund*, etc.' " (*California G. & E. Corp.* v. *Union Trust Co., supra,* 178 Cal. at p. 71.)

The other case cited as authority in *Keene* for the proposition that a fund includes property of value which may be converted into cash is *State* v. *Finney* (1935) 141 Kan. 12 [40 P.2d 411]. In *Finney* the defendant argued that funds of a bank included only government, state, county, municipal securities or other forms of indebtedness. In rejecting this argument, the court discussed the meaning attributed to "funds":

"The word 'funds' has a much broader meaning than is contended for by defendant. It has been held to have the following meaning (quoting from p. 828 Black's Law Dictionary):

" 'Fund, n. A sum of money set apart for a specific purpose, or available for the payment of debts or claims. * * *

" 'In the plural, this word has a variety of slightly different meanings, as follows: '1. Money in hand; assets; cash; money available for the payment of a debt, legacy, etc. Galenda Ins. Co. v. Kupfer, 28 Ill. 835, 81 Am. Dec. 284; United States v. Jenks (D. C.) 264 F. 697, 698; Wherrell v. U. S. (C. C. A.) 18 F. (2d) 532, 533; Federal Reserve Bank of St. Louis v. Quigley (Mo. App.) 284 S. W. 164, 166; National Surety Co. v. Williams, 74 Fla. 446, 77 So. 212, 221; Bishop v. United States (C. C. A.) 16 F.(2d) 406, 408; Johnson v. State, 37 Ga. App. 129, 139 S.E. 118, 119.

" '2. The proceeds of sales of real and personal estate, or the proceeds of any other assets converted into money. (Citing case).

" '3. Corporate stocks or government securities: in this sense usually spoken of as the "funds."

" '4. Assets, securities, bonds, or revenue of a state or government appropriated for the discharge of its debts.' (Citing cases.)

"Quoting from 4 Words and Phrases, First Series, 3004:

" 'The word "fund," in its broader meaning, may include property of every kind. In re Tatum, 70 N.Y.S. 634, 635, 61 App.Div. 518 (citing And. Law Dict.). * * *

" ' "Funds" include money and much more, such as notes, bills, checks, drafts, stocks and bonds. United States v. Greve (D.C.) 65 F. 488, 490;

Hasbrook v. Palmer, 11 Fed. Cas. 766 [Fed. Cas. No. 6,188]; Ayres v. Lawrence, 59 N.Y. 192, 198.'

"See, also, Johnson v. State, 37 Ga.App. 129, 139 S.E. 118. There the court held: 'In indictment under Laws 1919, p. 216, § 20, charging defendant, being an officer and employee of bank, with embezzling, abstracting, and misapplying moneys and funds of bank in named amount, the word "funds" includes all bank's available assets, and hence instruction permitting conviction, if money, checks, note, funds or assets were embezzled, was not erroneous.' " (*State* v. *Finney*, *supra*, 40 P.2d at p. 421.)

The meaning of the term "funds" was discussed in *Hospital Service of California* v. *City of Oakland* (1972) 25 Cal.App.3d 402 [101 Cal.Rptr. 800]: "Although commonly its meaning is 'available pecuniary resources ordinarily including cash and negotiable paper that can be converted to cash at any time without loss' [citations], it has been given far broader definitions such as, 'the assets of an estate' [citation] including real estate [citation], 'capital' [citation], 'assets' [citation], and 'property of every kind' [citation]." (*Id.* at p. 406.)

The common meaning of the term "funds" is the " 'available pecuniary resources ordinarily including cash and negotiable paper that can be converted to cash at any time without loss.' " (25 Cal.App.3d at p. 406.)

Settled rules of statutory construction require that in criminal cases an ambiguity should be resolved in favor of the defendant. (*People* v. *Belmontes* (1983) 34 Cal.3d 335, 345 [193 Cal.Rptr. 882, 667 P.2d 686].) The term "funds" has a common meaning, as well as an expanded meaning given in particular situations. The ambiguity created by the differing meanings attributed to funds should be resolved in defendant's favor. Thus, we apply the common, more restricted, meaning here. If the Legislature had intended to make it felonious for a public official to embezzle any public property, it could have stated that embezzlement of *public property* is a felony. "Money is property" (*People* v. *Holtzendorff* (1960) 177 Cal.App.2d 788, 801 [2 Cal.Rptr. 676]), but all property is not money.

Thus, defendant is not culpable for a felony based on embezzlement of public funds under section 504 if what was stolen was not an available pecuniary resource of the public.

The case of *People* v. *Sperl* (1976) 54 Cal.App.3d 640 [126 Cal.Rptr. 907] does not change this result. In *Sperl* the defendant, a marshal, was accused of

violating section 524, misappropriation of public moneys. The defendant ordered a deputy marshal to transport a particular assemblyman and his family and staff wherever they wanted to go. The deputy did this for several months in a county car and at times used the assemblyman's car. The county paid the deputy a total of $1,759.72 as wages during the time he drove the county vehicle for these purposes. (54 Cal.App.3d at pp. 647-648.) The defendant asserted he did not misappropriate public moneys since his conviction was based on the use of the car and services of the driver. The court disagreed with defendant's position and relied on *People v. Holtzendorff*, *supra*, 177 Cal.App.2d at page 788:

"In *People v. Holtzendorff*, 177 Cal.App.2d 788 . . . , several employees of the Housing Authority were sent home by defendant to work on a campaign and were paid for this labor from Housing Authority funds. Although the court ruled that the moneys (salaries) misappropriated were not public moneys because they did not belong to the state or any political subdivisions, the court stated at page 806: 'The defendant argues that if anything was taken from the Authority it was *services*, not *money*. [Italics in *Sperl*.] But the services of these typing employees *was not a commodity paid for and received and then diverted from its authorized purpose*. [Italics added.] It was the Authority's money that was appropriated and it went for services already rendered, but not to the Authority, nor for any use or purpose in the lawful execution of defendant's trust.' . . .

"As in *Holtzendorff*, the services of the deputy were not a commodity paid for and received and *then* diverted from their authorized purpose. Here, defendant as a county officer misappropriated county funds (salaries) for personnel performing activities which were clearly outside the scope of their proper duties. Under such circumstances the trial court properly found that the transportation of Hayes, his family and staff resulted in a substantial monetary loss to the county by reason of the payment of the deputies' salaries while performing these improper tasks and that this constituted a misappropriation of public moneys within section 424, subdivision 1." (*People v. Sperl, supra*, 54 Cal.App.3d at p. 658.)

Here, the automobile was a commodity paid for and received and then diverted from its authorized purpose. There was no evidence presented below that defendant sought to be or was paid during the time he stole the lawnmower.

In discussing the challenge to the vagueness of the statute, the appellate court in *Sperl* stated the following: "Clearly it is a misappropriation of public

funds to use publicly owned vehicles for unauthorized private use." (*People v. Sperl, supra,* 54 Cal.App.3d at p. 661.) The court used this example to illustrate the defendant knew his conduct was forbidden by statute. However, as the court stated earlier in its opinion, the actual loss of funds the county suffered as a result of the defendant's conduct was the payment of the deputy marshal's salary for his time in performing the improper task. The use-of-public-vehicle comment in *Sperl* thus was dicta, and it does not address the present issue. Therefore, the comment is not authoritative on the matter of our interpretation of the meaning of "public funds."

The People rely on *People v. Nathanson, supra,* 134 Cal.App.2d 43, claiming the court found a felony offense under section 504 for the embezzlement of stationery valued at approximately $75. In *Nathanson,* a city councilperson used city stationary for campaign purposes. He was charged with a violation of section 504. The trial court set aside the indictment and the People appealed. The appellate court found the indictment was improperly set aside. The appellate court never discussed whether the charged crime was a felony or a misdemeanor. The case has no application here.

Applying the well-established meaning to "public funds," it cannot be said that the use of the automobile was an embezzlement of the public funds. Under section 514, the offense is alternatively provable as a felony if the value of the item embezzled exceeds the dollar amount necessary to prove grand theft, $400. (§ 487.) The People do not discuss this issue.

In the previously discussed case of *People v. Harby, supra,* 51 Cal.App.2d 759, in finding the defendant had embezzled government property by using the city-owned automobile for private purposes, the court held that there was an embezzlement of the property of the city "to the extent of its use." (*Id.* at p. 772.) Where government property is used rather than taken in a more permanent sense, value of the use is the appropriate test for determining a monetary equivalent of what was embezzled. To hold otherwise would have some absurd results. For example, if an employee used a fax machine once for an unauthorized fax, should that employee be found to have embezzled the entire value of the machine? We think not. If so, an employee who used the fax machine hundreds of times or took the fax machine would be guilty of the same offense as the one-time user. This would ignore the differing culpabilities of the defendants recognized by the petty theft/grand theft dichotomy. Defendant did not by his acts expose the county to the loss of the automobile; the county's loss was the loss of the use of that automobile for a certain amount of time. The value of the loss of use suffered by the county must exceed $400 to make the offense a felony.

The only evidence presented at trial established the salvage value of the automobile at $1,000. No evidence was presented as to the value of the limited use of the automobile. It certainly had value, but we have no reason to believe the value is anything near $400. Because the evidence failed to establish either embezzlement of public funds in any amount or the embezzlement of public property to the extent of more than $400 in value, we reduce the embezzlement to a misdemeanor.

## DISPOSITION

Defendant's embezzlement conviction is hereby reduced to a misdemeanor, and the trial court shall resentence him accordingly. In all other respects, the judgment is affirmed.

Stone (W. A.), Acting P. J., and Buckley, J., concurred.

A petition for a rehearing was denied November 17, 1993.