[Civ. No. 29865. Second Dist., Div. Four. May 1, 1967.]

HOWARD L. HOLTZENDORFF et al., Plaintiffs and Respondents, v. HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, Defendant and Appellant.

[Civ. No. 29866. Second Dist., Div. Four. May 1, 1967.]

HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, Cross-complainant and Respondent, v. HOWARD L. HOLTZENDORFF, Cross-defendant and Appellant.

(Two Cases.)

598

Jack E. Hildreth, Rogan & Radding, Harvey A. Sniderman and Richard R. Rogan for Defendant and Appellant and Cross-complainant and Respondent.

Loeb & Loeb and Herman F. Selvin for Plaintiffs and Respondents and Cross-defendant and Appellant.

FOX, J.*—This is an action to recover damages for the wrongful discharge of plaintiffs under their respective employment contracts with defendant. Holtzendorff was awarded $122,661 and Miss Rosien $85,538. Defendant has appealed.

Under its cross-complaint against Holtzendorff, defendant Housing Authority sought to recover money that it had paid to Holtzendorff to reimburse him for attorney fees and expenses in connection with certain criminal proceedings taken against him that grew out of his political involvement with defendant. Judgment was rendered in favor of the Housing Authority for $36,537.17 plus interest making the total amount of the judgment on the cross-complaint $38,442.16. Holtzendorff has appealed.[1]

The Housing Authority of the City of Los Angeles is a public corporation created pursuant to the Housing Authorities Law of the Health and Safety Code of this state (§ 34200 et seq.) which was enacted by the Legislature to qualify local housing bodies for federal loans under the United States Housing Act of 1937. (42 U.S.C. § 1401 et seq.) The Authority operates by and through five appointed commissioners who serve for staggered terms without compensation pursuant to section 34272 of the Health and Safety Code. The members of this commission are appointed by the Mayor of the City of Los Angeles, subject to approval by the city council.

Plaintiff Holtzendorff was hired as executive director, secretary and treasurer of the Housing Authority on February 1, 1941, and served under various written agreements until his discharge on March 26, 1963. Plaintiff Rosien was initially employed on July 26, 1938, and served under various written agreements as assistant executive director and assistant secretary until her discharge, also on March 26, 1963. At the time plaintiffs were discharged they were each serving under an employment contract with the Housing Authority which was executed on April 19, 1961,[2] for a term expiring on December

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1] By stipulation and pursuant to pretrial order the issues raised by the first amended complaint and the answer (the main case) were tried separately from the issues raised by the cross-complaint and the answer thereto re the recovery of reimbursement funds, and separate judgments were rendered in accordance with stipulation and pretrial order.

It was further stipulated (and with court approval) that certain legal issues in the main case should be separately tried by the court sitting without a jury, prior to trial by jury of the issues involving the ''discharge'' of plaintiffs.

[2] At the time these contracts were executed, each of the plaintiffs had

31, 1967. Each of these contracts provided that the employee's compensation shall consist of (a) salary—$21,700 per year for Holtzendorff and $16,500 per year for Miss Rosien; (b) the same vacation, sick leave, social security, health and welfare, life insurance and retirement benefits as, during the term of employment, were granted to other employees, and (c) the exclusive use of one of the Housing Authority's passenger vehicles.

Holtzendorff's contract provided that he was employed "in the administrative capacity of Secretary, Executive Director and Treasurer" to serve the Authority in operating its housing developments (of which there were 21 in number representing a capital investment of $63,500,000), and in the construction or operation of other housing developments, all "under the supervision and control of the Commissioners of the Authority." His powers, duties, and responsibilities were to be "administrative only and at all times in accordance with the By-laws and Manual of Policy and Procedure as established or changed by the Commissioners of the Authority from time to time." It was agreed, however, "that the nature and scope of said administrative duties will neither be increased nor decreased" during the period of employment without the employee's written consent. It was also agreed that the employee did not have and would not be authorized or have delegated to him any policy-making responsibilities or authority of any kind, but that all such power was reserved to the commissioners to be exercised only by them. Miss Rosien was employed as assistant secretary and assistant executive director to serve under the general supervision of the secretary and executive director. Her duties were similarly limited to those that were administrative only, performable in subordination to the policy and procedures established from time to time by the Authority's commissioners.

On May 18, 1954, the Housing Authority created the operation reserve fund (sometimes referred to as fund five), in the sum of more than $185,000, which funds were derived from the operation and sale of temporary war housing projects. Holtzendorff was given authority to expend up to $1,000 for any single purpose from this fund without prior commission approval when such expenditures were in the best interests of

---

a similar employment contract with defendant. Holtzendorff's contract was executed December 18, 1956, and expired December 31, 1962, and provided for a salary of $17,500 per annum. Miss Rosien's contract was entered into February 19, 1958, and expired December 31, 1963, at an annual salary of $12,468.

the Housing Authority. Holtzendorff's authority with respect to expenditures were later increased to $5,000 by amendment to the Manual of Policy and Procedures.

As of April 1, 1954, the Housing Authority entered into a contract with the Continental Assurance Company to purchase annuities for all employees who were employed by the Authority on or about April 16, 1950, without cost to them, and agreed to pay one-half of the cost of annuities for those employees in the service of the Housing Authority as of April 1, 1954, provided said employees would pay the other one-half of said costs. This agreement was designated the basic retirement plan.

On April 21, 1959, defendant adopted a resolution to purchase certain annuities under a plan designated as the supplementary retirement fund. This fund was originally funded October 1, 1960, by the payment from defendant's operation reserve fund five of the sum of $59,338.86. This fund was solely for the benefit of the employees of defendant who had been continuously employed since April 1954, and a member of defendant's basic retirement plan. No part of the supplementary retirement fund was paid by defendant's employees and the employees' rights in this fund immediately vested after they had been continuously employed by defendant for 15 years. The plan further provided for future benefits to be paid solely by defendant.

On December 4, 1957, Holtzendorff was indicted by the Grand Jury of Los Angeles County on 21 counts of embezzlement of public monies in violation of section 424, subdivision 2 of the Penal Code and on 21 additional counts for the same felony in violation of section 504 of said Code and on 10 counts of falsification of public records in violation of section 424, subdivision 3 of said code. Holtzendorff made a motion under section 995 of the Penal Code to set aside the indictment which was granted. Appeal was taken, and the Court of Appeal in *People* v. *Holtzendorff*, 177 Cal.App.2d 788 [2 Cal. Rptr. 676],[3] on February 15, 1960, reversed the order as to all counts charged in violation of section 504 and affirmed it as to all other counts.

On November 14, 1960, the defendant was found not guilty on the counts charging a violation of said section 504.

On November 29, 1960, Holtzendorff presented to the defendant a claim for reimbursement of legal fees and expenses

[3]Hearing was denied by the Supreme Court.

incurred by him in connection with his defense in the amount of $36,537.17. This claim was approved and paid November 30, 1960. It is this item that forms the foundation of the defendant's cross-complaint against Holtzendorff.

On July 2, 1962, four new commissioners were appointed to the defendant Housing Authority. About a week later the commissioners adopted a resolution providing in part that Holtzendorff should consult the chairman of the Housing Authority in connection with all policy and administrative matters prior to any determination made by him, the executive director. At the time the resolution was proposed and adopted, Holtzendorff requested to be relieved of duty in order to take appropriate legal action on the ground that this resolution was a violation of defendant's by-laws, a breach of his contract and one under which he could not operate. After an executive session Holtzendorff withdrew this request.

Pursuant to this same resolution, an audit of defendant's operation reserve fund five was authorized. This audit was made by James Corcoran, a C.P.A., and submitted to the Housing Authority on October 12, 1962. Certain items of this audit became a source of acute controversy between the chairman of the Authority and Holtzendorff.

On December 4, 1962, plaintiffs filed separate actions against the Housing Authority to determine their rights under their employment contracts. These actions were superseded by this litigation.

On March 21, 1963, the Governmental Efficiency Committee of the Los Angeles City Council held hearings with respect to the operation of the Housing Authority, the activities of Holtzendorff and the purposes for which certain funds, particularly from operation reserve fund five, had been expended. The Authority's chairman, in response to a subpoena, presented a statement to the council committee touching a number of these matters. On March 25, Holtzendorff read a statement dealing, *inter alia,* with the matters referred to in the chairman's previous statement before the committee and explaining the reason and authority for certain expenditures that had been made out of fund five and which had been criticized by the chairman of the Authority.

On the day following Holtzendorff's appearance before the city council committee, the Housing Authority held a meeting during which a resolution was adopted terminating Holtzendorff's employment contract. The commission then took up Miss Rosien's situation and voted to suspend rather than dis-

charge her. She made inquiry and was told the suspension was without pay whereupon she declared that in the circumstances she considered it a dismissal. Later at this same meeting the position for which Miss Rosien had been employed was abolished.

In addition to their general verdicts, the jury was requested to return special verdicts by answering the following interrogatories: "Was plaintiff Holtzendorff discharged by the defendant Housing Authority of the City of Los Angeles on March 26, 1963, for just or lawful cause? (Answer yes or no) No." The jury was asked to answer a like interrogatory with respect to the discharge of Miss Rosien and gave the same answer.

We first examine the contention of the Housing Authority that the contracts of employment are void on the ground that they cover a period that extends beyond the term of any of the members of the commission. Examination of the Health and Safety Code provisions relating to Housing Authorities reveals that defendant has express and specific power to employ a secretary and executive director and to fix the qualifications, duties, terms of employment and compensation therefor. Section 34278 provides that: "An authority shall select from among its commissioners a vice chairman. It also may employ a secretary, who shall be executive director, . . . and such other officers, agents, and employees as it requires, and shall determine their qualifications, duties, terms of employment and compensation." The Authority is also expressly given the power to "Make and execute contracts" (Health & Saf. Code, § 34311) and to "contract for the furnishing by any person . . . of services . . . for, or in connection with, a housing project or its occupants." (Health & Saf. Code, § 34314.) This grant of power to "determine . . . terms of employment," without any statutory limitations of the power, necessarily confers a wide discretion on the Housing Authority to fix the specific provisions of such an agreement. Since the statute does not prescribe the tenure, duties or compensation of the secretary of a housing authority these incidents of the employment must, therefore, obviously be left for determination in the employment contract. For, as was held in *Main* v. *Claremont Unified School Dist.*, 161 Cal.App. 2d 189 [326 P.2d 573], the word "employ" implies the making of a contract. Furthermore, "an employment is, as a rule, based upon a contract with the employee, defining his duties, fixing his compensation and determining the period of his

employment.'' (*Leymel* v. *Johnson,* 105 Cal.App. 694, 701 [288 P. 858]; *Foucht* v. *Hirni,* 57 Cal.App. 685, 691 [208 P. 362].)

The discretion conferred by section 34278 upon the defendant is clearly broad enough to include the hiring of employees for a fixed term rather than at will. In fact, the legislative history of section 34278 indicates that it was the purpose of the section to authorize hiring for a fixed term rather than only for a period at will.

The section was added to the code in 1951. At that time it authorized the Housing Authority to employ a secretary and such other permanent or temporary employees as were required and to ''determine their qualifications, duties and compensation.'' It will be observed that there was no reference in the section as it then existed relative to ''terms of employment.'' It will be observed, however, that there was a distinction noted between permanent and temporary employees from which it was at least inferable that some kind of fixed tenure or term of employment was contemplated, but any such inference was dispelled in 1953 by an amendment that deleted the reference to permanent and temporary employees and added a provision that the secretary should ''serve at the pleasure of the commission.'' Thus, it was made clear that the secretary could not be employed for a fixed term but only for a period at the will or pleasure of the commission.

In 1957, however, and before the contracts here involved were executed, section 34278[4] was amended to its present form. This amendment deleted the provision that the secretary should serve at the pleasure of the commission and added the provision that the commission had the power to determine the ''terms of employment'' of its secretary and other employees. The purpose of this change is apparent from its language and from its contrast to the section as it had read immediately before the change. That purpose was to enable the authority to fix the terms of employment so as to give all of its employees, including the secretary, a fixed term if it so desired. Had the Legislature wanted to put a limit on the term for which the employment contract could be made it would no doubt

[4]Health & Saf. Code, §§ 34275 and 34280 on which the Authority relies do not undertake to put any limits, restrictions, or conditions on the ''terms of employment'' that the Authority, acting under the power conferred by § 34278, may fix.

have done so as it did in 1953. The failure to make such a provision in 1957 implies the absence of any such limit as that urged by defendant. In an analogous context, namely, an attack upon a public contract because it extended beyond the terms of office of the contracting board, the Supreme Court observed that if ''the legislature desired to restrict municipalities in this particular, it could easily do so by the passage of a law . . . . (*McBean* v. *City of Fresno*, 112 Cal. 159, 169 [44 P. 358, 53 Am. St. Rep. 191, 31 L.R.A. 794]; *King City Union High School Dist.* v. *Waibel*, 2 Cal.App.2d 65, 69 [37 P.2d 861].)

It follows that, since the Authority has the power to enter into employment contracts, such contracts are binding upon and enforceable against the Authority. ▮ Contracts entered into by the state or one of its agencies or subdivisions are governed by the ordinary law of contracts and the public body is bound ''in like manner as an individual.'' (*Souza & McCue Constr. Co.* v. *Superior Court*, 57 Cal.2d 508, 510 [20 Cal.Rptr. 634, 370 P.2d 338]; *Western Title Guar. Co.* v. *Sacramento & San Joaquin Drainage Dist.*, 235 Cal.App.2d 815, 820 [45 Cal.Rptr. 578].)

▮ The ''law is settled in California that a contract made by the council or other governing body of [a public agency] . . . is neither void nor voidable merely because some of its executory features may extend beyond the terms of office of the members of such body. . . . a contract is binding upon the [public agency] and may not be summarily canceled by a successor council. . . .'' (*Denio* v. *City of Huntington Beach*, 22 Cal.2d 580, 590 [140 P.2d 392, 149 A.L.R. 320].) This case held valid a contract where a city employed a lawyer for a term extending beyond that of the council that authorized the contract. In *Cope* v. *County of Sutter*, 206 Cal. 445 [274 P. 750], the court held valid a contract by county employing an architect for a term beyond the term of office of the board of supervisors that approved the contract. In *McBean* v. *Fresno, supra*, at p. 169, the court upheld a contract by which plaintiff agreed to take care and dispose of the city sewage for five years. The court observed that ''there is in this state no inhibition against the making of a contract by a municipal board which shall extend . . . beyond the term of office of the board which makes it.''

It is significant in relation to the permissible length of term that the only restrictions on that length is a general law that an employment contract is not enforceable against the *em-*

*ployee* beyond seven years from the beginning of service under it. (Lab. Code, § 2855.) There is no limit on its enforceability against the employer. The term of the contracts involved at bench was less than seven years. Defendant places great emphasis upon the Pennsylvania case, *Mitchell* v. *Chester Housing Authority,* 389 Pa. 314 [132 A.2d ·873], in support of its contention that a contract may not extend beyond the terms of the board that approved it. That case, however, is readily distinguishable. There was no express or other authorization in Pennsylvania, as there is in California, for a housing authority to enter into employment contracts and to determine the qualifications, duties, compensation and terms of employment. The relevant statute there provided only that the "Authority may employ a secretary . . . other officers, agents and employees . . . and may determine the qualifications of such persons . . ." and the by-laws of the authority provided that the "Secretary shall hold office for an indefinite term at the pleasure of the Authority." (See 132 A.2d at p. 874.) It is thus apparent that *Mitchell* is not applicable to the case at bench.

The Housing Authority also argues ·that the employment contracts are invalid because of the delegation of nondelegable public duties. The answer to this argument is found in (1) the language of the contracts and (2) the finding of the court with respect to the character of the duties assigned to plaintiffs and the responsibilities retained by the commissioners.

Section 1 of the employment contracts, provided in pertinent part, that "it is mutually agreed and understood that the powers, duties and functions of Employee shall be *administrative only* and at all times shall be in ·accordance with the By-laws and Manual of Policy and Procedure as established or changed by the Commissioners of the Authority from time to time." (Italics added.) Section 1 of the contract further provides that "it is specifically understood and agreed that Employee has not and will not be delegated or authorized to exercise any policy making responsibility or authority of any kind, including, but not limited to, the police powers of the Authority. It is clearly understood that all such powers are reserved to the Commissioners of Authority in office from time to time and shall only be exercised by them."

The manner in which these contracts operated with respect to the duties assigned to the employee and those reserved to the Authority is determined in the court's finding: viz., that

the employment contracts delegated or assigned to plaintiffs duties that were "administrative only, the performance of which was at all times subject to the control, direction and supervision of the governing body, *i.e.*, the Commissioners of the defendant Housing Authority." And that "All of the duties, powers, functions and authority of the Commissioners were reserved to and retained by them at all times material herein." Further, the commissioners' power to "Make, amend, and repeal by-laws and regulations" (Health & Saf. Code, § 34311, subd. (e)) or otherwise to function as the Authority's governing body (Health & Saf. Code, § 34275) was not sought to be and was not in fact limited. It is thus apparent that the employment contracts did not assign to plaintiffs any nondelegable duties either under the express terms thereof or under their interpretation.

Defendant bases its argument re the unlawful delegation of its public duties, in part, on these provisions of the employment contract. (a) In section 1, the contract states: "[I]t is mutually understood and agreed that the nature and scope of said administrative duties will neither be increased nor decreased during the period of this Agreement without the written consent of Employee," and (b) section 2 provides that "Section 6 of the By-laws of the Authority [which defines the duties of the secretary] is not to be interpreted contrary to Sections 1 and 2 of this Agreement." This argument is irrelevant, for even assuming it is sound as to the invalidity of those provisions, this does not affect the judgment. Holtzendorff did not seek enforcement of these provisions; the judgment neither enforces them nor depends in any way on their validity. These provisions are severable[5] from the provisions that were enforced at bench and do not affect the validity of the other provisions.

We shall now consider the special verdicts of the jury that the discharges of plaintiffs were without good cause.

█ To terminate an employment without the expiration of its contractual term "there must be good cause." The grounds for terminating such an employment are stated in Labor Code section 2924. That section provides: "An employment for a specified term may be terminated at any time by the employer in case of any wilful breach of duty by the

---

[5]Each contract has a severable provision in the event any part of it is declared invalid.

610

employee in the course of his employment, or in case of his habitual neglect of his duty or continued incapacity to perform it." It is therefore not every deviation of the employee from the standard of performance sought by his employer that will justify a discharge. There must be some "wilful act or wilful misconduct . . ." when the employee uses his best efforts to serve the interests of his employer. (*Goudal* v. *C. B. DeMille Pictures Corp.*, 118 Cal.App. 407, 413 [5 P.2d 432, 7 P.2d 174].)

▮ Three grounds are urged in the briefs to justify the discharge of plaintiffs.[6] The first of these is the payment by Holtzendorff of some $5,500 from the operation reserve fund five to Miss Rosien to cover accumulated vacation and sick leave pay.

Under her contract part of Miss Rosien's compensation was "the same vacation, sick leave . . . and retirement benefits now granted, or during the term of employment . . . is granted, to other employees of the Authority." It is established that at all times here material the Authority maintained a plan or policy for vacation and sick leave benefits, approved and adopted by the commissioners of the Authority. The amended complaint alleged in detail the specific provisions of that plan, namely, the accumulation of 10 hours of vacation time and 4 hours of sick leave time for each calendar month of service in the preceding 12 months and the payment, if not taken, of a sum computed by multiplying the accumulated time by specified fractions of the employee's annual compensation. The correctness of this formula was not challenged.

On February 20, 1962, the governing board of the Authority adopted a resolution authorizing the payment to Miss Rosien of $5,515.87 in full discharge of the Authority's obligation to her for earned and accumulated leave time. The leave time earned was accumulated to her credit just as it was for other employees so situated; and it would appear that the Authority was obligated to pay her the cash value according to the established formula for such accumulated time. At the end of each year the governing board authorized each such employee, including Miss Rosien, to carry over the accumulated time, resolutions to that effect being regularly adopted. From these circumstances it would appear that the jury could

[6]At oral argument counsel for the Authority conceded that sufficient showing had not been made to establish "good cause" for the discharge of Miss Rosien.

reasonably find that this incident did not show good cause for the termination of the employment contracts of either of the plaintiffs.

Defendant's reliance upon *Jarvis* v. *Henderson,* 40 Cal.2d 600 [255 P.2d 426], is misplaced. That case held that the salary of a civil service employee, fixed by statute, could not be increased by allowance of overtime pay. Here, no statute fixes salary. The applicable statute impowers the Authority to enter into an employment contract, and fix the employee's "terms of employment and compensation." (Health & Saf. Code, § 34278.) Vacation and sick leave benefits were expressly fixed in the employment contract as a part of Miss Rosien's compensation.

█ The second ground upon which defendant seeks to justify the discharge of Holtzendorff is the fact that he had listening devices installed in the offices of defendant; also in the office of the principal supervisors, the commission room and offices in the financial department. Plaintiffs were able to overhear conversations of persons working in these areas of defendant's offices. According to Miss Rosien these listening devices were installed in the new offices early in 1960. They were purchased from the operation reserve fund. The monitoring system was said to have been installed mainly for reasons of security against Communist infiltration of which it was claimed the Authority had had some experience, and in a lesser degree for determining employee efficiency and for security against the pilfering of cash, considerable amounts of which were handled and counted by defendant's personnel. Because of these security reasons knowledge of the system was not disseminated throughout defendant's personnel. But its existence and use were made known to Mr. Beavers who was then chairman of the Authority. "He said that it was perfectly all right, that we should do everything that we possibly could to see to it that the Housing Authority was never again infiltrated" by the Communists. Holtzendorff testified the existence of this monitoring system was made known to Chairman Blodgett soon after he became chairman early in July 1962. Blodgett suggested that it be removed. Holtzendorff stated that he promptly followed out this suggestion. Nothing was done thereafter about the monitoring system by the chairman or any other commissioner, according to Holtzendorff.

It is apparent there was evidence from which the jury could have inferred that the monitoring system was installed and operated in a good faith effort to preserve and further the

best interests of the Housing Authority. The inference of good faith with respect to the installation and use of this monitoring equipment must be deemed to have been drawn by the jury since it tends to support the verdict.

The jury, taking into account all the facts and circumstances relating to the monitoring incident, reasonably could have determined that it did not justify the discharge of Holtzendorff.

■ The third ground upon which Holtzendorff's discharge is attempted to be justified was his testimonial statement before the Governmental Efficiency Committee of the Los Angeles City Council.

The hearing before the city council committee appears to have grown out of a letter written by Commissioner Vie on March 11, 1963, in which he suggested that certain aspects of the Housing Authority's activities be investigated by the city council. These related to (1) possible use of city funds for noncity purposes; (2) certain possible misconduct by certain commissioners of this Authority, and (3) certain possible improper influencing by city officials of contracts of this Authority. This letter was referred to the above council committee which set a date for hearing thereon. It issued a subpoena to the chairman of the Authority and to the other commissioners. It also issued a subpoena to Holtzendorff. On March 21, 1963, Mr. Blodgett, the chairman of the Housing Authority, appeared before the council committee and presented a statement in writing. He mentioned, *inter alia*, that when he and three other newly appointed commissioners appeared before the council committee on county, state and federal affairs prior to their confirmation by the City Council they "were urged by these councilmen to exert every effort to 'clean up the sorry mess which has existed for many years in the [Housing] authority.' " The chairman noted that at the first meeting of the commission it was unanimously agreed to institute an inquiry into the fiscal and management policies of the Housing Authority and the competence of its staff. He went on to say that "Our findings to date have starkly confirmed the council committee's fears that the Housing Authority is indeed a sorry mess." He noted that "We learned listening devices were concealed in the ventilating ducts of the commission room and the auditors office, as well as other offices throughout the building. These concealed devices were ordered removed immediately by this commission." Also, "Our fiscal inquiries disclosed the existence of an operational reserve

fund, also known as fund 5, which was separate from the Public Housing Administration funds and was not subject to audit by the PHA.'' The chairman pointed out that the commission authorized an audit by a certified public accountant, and that ''This audit revealed that fund 5 had been grossly and frequently raided by expenditures the fund was never intended to pay. In effect, the fund had become a cookie jar for outrageous and improper expenditures.'' He noted, by way of example, that the audit of fund 5 disclosed that money had been used from it to pay $5,515.87 to Miss Rosien in lieu of vacation time claimed by her to have accrued since 1951; that $2,000 had been paid for law books and reference books purchased by the executive director for his personal use and later sold by him to the Housing Authority; that the amount of $36,000 for legal fees and approximately $10,000 other charges for the representation of the executive director as a result of litigation arising from his indictment by the grand jury, and the amounts of $4,100 each for two automobiles purchased for the executive director and assistant executive director had come from this fund. The chairman then commented that ''These are but a few of the items charged to fund 5 that this commission believes improper.'' He stated, ''We have referred several of the above items to our general counsel for review.'' The chairman further commented, ''There are many others we believe to have been improperly charged to fund 5 . . . .'' which he enumerated as examples.

He pointed out that ''as a result of consistently inaccurate minutes kept by the executive assistant of commission meetings, and for other reasons, the commission was forced to authorize the retention of a certified statement reporter to accurately report verbatim commission meetings.'' He concluded his statement with this comment. ''The investigation is continuing and will continue until we have complied with the city council committee's original instructions 'to clean the whole mess up.' ''[7]

The statements of the chairman were denunciatory and accusatory and undeniably either directly or inferentially referred to Holtzendorff and Miss Rosien (more particularly to

---

[7]These portions of chairman Blodgett's statement to the committee are set forth as a foundation for considering the element of provocation in Holtzendorff's reply when he appeared before the committee on March 25, 1963. We do not pass upon the truthfulness, accuracy or completeness of the information purportedly contained therein. Those were matters for the jury's consideration.

the former). Holtzendorff had a right to be heard if he felt any of the statements were untrue, inaccurate, incomplete or unfair. That opportunity was presented by reason of a subpoena served on Holtzendorff to appear before the committee and testify.

At this point it should be noted that the giving of testimony before the committee was not anything done by Holtzendorff ''in the course of his employment.'' It was *testimony* given by him in response to a subpoena before an investigating body having the power to compel testimony. He could not have been prevented or lawfully ordered by his employer not to give it. It was a matter entirely between the committee and the witness, over which the employer had no control. (Cf. *Petermann* v. *International Brotherhood of Teamsters C. W. & H., Local 396,* 214 Cal.App.2d 155, 158 [29 Cal.Rptr. 399].)

It should also be noted that we are concerned here with defendant's reliance upon a precise, statutory ground of discharge—breach of duty in the course of employment. Holtzendorff owed his employer no duty in respect to his testimony. His only duty in that respect was to the law, and his conscience; that is, his duty to respond to the subpoena and to obey the testimonial oath to tell the truth, the whole truth and nothing but the truth. He could not lawfully be controlled in any way by his employer as to the manner in which he fulfilled that oath. (Cf. *Petermann* v. *International Brotherhood of Teamsters C. W. & H., Local 396, supra,* at p. 158.)

The significance of some of the comments of the chairman of the Authority to the city council committee had a natural tendency to provoke a response from Holtzendorff of an emphatic character. This is a factor that the jury could properly take into account in evaluating Holtzendorff's testimony before the committee. The essential question on this aspect of this controversy is whether Holtzendorff committed a breach of an employee's duty to refrain from what Labatt calls ''insolent, offensive, and threatening words and behavior.'' (1 Labatt, Master and Servant (2d ed.) p. 930.) This question is one of fact, to be decided in the light of all the circumstances of the case as to what led up to the testimony before the committee, the extent to which it was provoked by the prior statement to the committee by the chairman of the Authority, and its reasonableness as an exercise of the employee's right to protest and defend himself against charges that he felt were either untrue, inaccurate or incomplete in their statement. In this connection, Labatt (*op. cit. supra,*

§ 299, p. 932) states: "As the various kinds of language and behavior which constitute a breach of the duty [to refrain from insolent, offensive and threatening conduct] . . . are described by terms which are not susceptible of any precise legal definition, the question whether, in any given instance, a breach was committed, is essentially one of fact, and therefore primarily for the jury."

We shall now note a few of the statements made by Holtzendorff in his 25 pages of testimony before the council committee.

At approximately the outset of Holtzendorff's appearance before the city council committee he made these comments:

"Before the first meeting of this Committee convened last Thursday, March 21, 1963, Mr. Julian Blodgett, Chairman of the Authority, released to the press copies of a written statement he intended to read as a witness to this Committee.

"This statement in no way replied to any of the questions raised by Commissioner Vie in his letter to the Council of March 11, 1963. Instead, it contained a series of malicious, false and defamatory statements attacking the Director and Assistant Executive Director of the Housing Authority.

"This attack of course was intentionally calculated to divert this Committee and the public's attention from the matter under investigation, to wit: Commissioner Vie's" questions in his letter of March 11, 1963.

Holtzendorff then continued:

"While I have no intention of in any way assisting in this diversionary effort, I wish, on the part of both myself and the Assistant Executive Director, Miss Rosien, to state that all expenditures from the Authority's Operation Reserve Fund were approved and authorized by the Commissioners then in office by official Commission action after each of said actions were approved by either the then attorney for the Authority, or in some cases the City Attorney. I also wish to categorically deny for both myself and Miss Rosien any and all inferences, innuendos, or statements that any of the expenditures made from this fund to either of us or on our behalf was in any way irregular or improper."

The witness later testified:

". . . . Mr. Blodgett does not agree with his predecessor Commissioners as to some of the expenditures approved and authorized by them. He picks out 7 or 8 old items out of hundreds, characterizes the fund as a 'Cookie Jar for outrageous and improper expenditures,' and after viewing them

with alarm through a gigantic magnifying glass, concludes that the Housing Authority is a 'sorry mess.' ''

The witness handed the chairman of the committee a copy of the audit report filed by Mr. Corcoran, C.P.A. with the, Authority on October 12, 1962, attached to which was an opinion by E. H. Delorey, Esquire, counsel for the Authority, which read in part as follows: ''Certain questions were raised by the examiners in connection with the conduct of the Authority in connection with the Operation Reserve Fund, each of which questions were answered by the report in its exhibits by virtue of the fact that each item to which reference is made in the body of the report appears to have been authenticated and approved by either action on the part of Legal Counsel for the then acting Commission or the opinion from the City Attorney's office itself.

''It therefore seems inappropriate, if not futile, at this time to reevaluate prior opinions for the conduct authorized by them.''

The witness also handed the committee a copy of the Authority's independent contract auditor's reports of the Authority's operation reserve fund from the date of its establishment in 1954 to date. In addition the witness furnished the committee with the reporter's verbatim transcript of the commission meeting of January 24, 1963, at which time the commission gave final consideration to and ordered the Corcoran audit report of October 12, 1962, accepted and filed. Pages 65 and 66 of said transcript reads, in part, as follows: '' 'The Chairman: Are there any comments from the Commission? If there are no comments from the other members of the Commission, I would like to say just one thing before we accept and file the original copy of the report and the opinion of our Legal Counsel. That is this: that as a new member of this Commission, appointed effective July 2, 1962, I as well as others of the new appointees, new Commissioners, were recipients of rumors, allegations of one sort or another, concerning the operation and management of the Operation Reserve Fund of the Los Angeles Public Housing Authority.

'' 'As a result, at the meeting of July 10 of the past year, this Commission adopted a Resolution authorizing the audit and review of the Operation Reserve Fund by an outside, unbiased source so that these rumors, these allegations, could either be dispelled entirely, once and for all, or if there was any substance to them, that this new Commission, the 4 new

members, I should say, would be in a position of having the unbiased review and research.

" 'Now, you have all heard Mr. Delorey's opinion. You have all had the opportunity of reviewing Mr. Corcoran's report and certainly there was nothing which would lend substance to any of the rumors or allegations of any management or activities which was of an illegal nature.

" 'In addition, as Mr. Holtzendorff has said, this inquiry and report summarizes, brings up to date, all of the major expenditures from the Operation Reserve Fund, and as far as I am concerned, has certainly dispelled any allegations of anything of an illegal nature, insofar as the expenditures were concerned, and I think and I affirmatively believe that it is [to] the benefit of us new members of this Commission to have this report as a guide to us in our tenure as members of this Commission.

" '. . . If there is no further comment, the Special Report of the Los Angeles Housing Authority Operation Reserve Fund, dated October 12, 1962, and the exhibit will be accepted and filed.' "

The witness commented: "Thus, the documented record I have just read clearly and irreputably [sic] puts the lie to any and all remarks of Mr. Blodgett or anyone else, who now tries to use the Corcoran Operation Reserve Fund Special Audit Report as the basis to libel and slander of [sic] the Executive Director or the Assistant Executive Director."

The witness mentions, "Mr. Blodgett specifically criticized the alleged 'inaccurate minutes kept by the Executive Assistant of Commission meetings' and that this was the reason why a Certified Statement Reporter had been employed to report verbatim Commission meetings." The witness then commented: "Like all his other accusations—the record clearly indicates that this is not true." With respect to the removal of the monitoring system or listening devices, Holtzendorff had this to say: "Mr. Blodgett's statement also overemphasizes and incorrectly states that, 'We (the Commission) learned and ordered the removal of listening devices from the Central Office building of the Authority.' This statement is not true."

With respect to the chairman's remarks about the payment of $2,000 to Holtzendorff for his law books he has this to say: "Finally, I wish to point out that Mr. Blodgett's remarks that $2,000 was paid from the Operation Reserve Fund to me for the purchase of my law books is wholly false. These books

were not paid for from this fund. They were paid for from the regular fund of the Authority and said payment was duly authorized by the Commission and approved by the Public Housing Administration." The witness handed the committee a copy of a resolution authorizing said purchase together with a copy of a letter from the Public Housing Administration approving same.

The question with respect to Holtzendorff's statement therefore is—did it go beyond the bounds of the provocation that produced it? To put the matter another way, was his statement so insolent, disrespectful and offensive as to justify his discharge? Whether it was of that character was a question for the jury. Furthermore, in determining whether it was of that tenor the provocation that gave rise to it cannot be ignored. The whole point of the provocation rule is that conduct which, if unprovoked, might be cause for discharge may not constitute such cause when the employer has provoked it. Implicit in the jury's special verdict that there was not good cause for the discharge of Holtzendorff is the implied finding that his testimonial statement before the committee did not go beyond the bounds of the provocation that produced it. In the circumstances we cannot say as a matter of law that the jury was not justified in the rendition of its special verdict.

Defendant argues that the contracts of plaintiffs were invalid because they were not limited to a term not exceeding four years. The Authority bases this contention on section 16, article XX, of the state Constitution.[8]

The trial court, however, found that: "Neither of the plaintiffs was at any time an officer or commissioner of the State of California or of any political subdivision thereof. Neither of the plaintiffs had or exercised, as part of his or her employment by the defendant Housing Authority, any sovereign power of the State of California or of any political subdivision thereof. Neither the Holtzendorff nor Rosien Employment Contract was required to be, nor was either of said contracts invalid because it was not, limited to a term not exceeding four years. The defendant Authority is a body corporate and politic and each of the plaintiffs is an officer thereof."

It will be observed that this constitutional provision by its

---

[8]So far as material here those provisions are: "When the term of any officer or commissioner is not provided for in this Constitution, the term of such officer or commissioner may be declared by law; and, if not so declared, such officer or commissioner shall hold his position as such officer or commissioner during the pleasure of the authority making the appointment; but in no case shall such term exceed four years; . . ."

express terms applies only to an "officer or commissioner" not to an employee. This is a self-evident proposition. In *Stewart* v. *Eaves*, 84 Cal.App. 312 [257 P. 917], the court held, upon facts closely similar to those at bench, that a school superintendent was not an officer but only an employee within the meaning of a constitutional provision prohibiting an increase in the compensation or an extension of the term of an officer "after he had been appointed." Whatever sovereign or governmental powers are given to a housing authority are expressly given not to an individual or officer but to the "authority." (Health & Saf. Code, §§ 34310, 34312, 34315, 34317, 34318, 34319, 34325, 34351.) The functions of the Authority are vested in its commissioners (Health & Saf. Code §§ 34270, 34275), upon whose vote "[A]ction may be taken by the authority." (Health & Saf. Code, § 34276.) None of those powers could be exercised by plaintiffs. The situation at bench is therefore analogous to that in *Main* v. *Claremont Unified School Dist.*, 161 Cal.App.2d 189 [326 P.2d 573], where the court held (p. 204) that a school superintendent was an employee rather than an officer. This conclusion was impelled by the fact that in "no real sense does the superintendent exercise independent powers. Always he operates under control of the board and hence exercises none of the sovereignty of the state," citing *Stewart* v. *Eaves, supra,* and numerous other authorities. In like manner, plaintiffs at bench always operated under the control of the Authority and hence exercised none of the sovereignty of the state.

It should not be overlooked that the enabling statute speaks in terms of employment, *i.e.*, an authority "may *employ* a secretary. . . ." (Health & Saf. Code, § 34278; italics added.) This is indicative of employee rather than officer status. Similar significance was given to the statutory language in *Main* where the court noted that the enabling statute provided that the school district "may *employ*" (court's emphasis) a superintendent.

The net result of the factual picture is that the trial court reasonably could draw inferences that plaintiffs were employees, not officers or commissioners. They operated under control of the Authority, hence, they exercised none of the sovereignty of the state. (*Main* v. *Claremont Unified School Dist., supra,* 161 Cal.App.2d 189, 204.) It is tenure or term of office, not term or duration of employment with which section 16 deals. The challenged finding, quoted above, has adequate evidentiary support, and the constitutional provision on

which defendant relies has no application to plaintiffs' contracts.

Defendant refers to and quotes at length various provisions of the Authority's by-laws and Manual of Policy and Procedure, in an effort to show that plaintiffs were vested with a part of the state's sovereignty. Defendant neglects, however, to refer to those portions of the employment contracts that provide "that the powers, duties and functions of Employee shall be *administrative only,* and at all times in accordance with the By-laws and Manual of Policy and Procedure as established or changed by the Commissioners of the Authority." (Italics added.) In this connection defendant also fails to mention that the powers or duties given to the secretary were given him by the Authority's by-laws and Manual of Policy and Procedure which were adopted and maintained by its governing board, the commissioners; and that those powers and duties were expressly made subject to the direction, control and supervision of the governing board. Defendant also failed to mention that so far as those duties dealt with matters of policy, the secretary's power was only to make recommendations to the commissioners. They, not the secretary, made the determination whether to put any particular recommendation into effect. Finally, section 6 of Article II of the Authority's by-laws provides that "the Executive Director . . . shall be charged with development and management of its housing facilities, and shall perform all duties of his office, *subject to the direction of the Commissioners of the Authority.*" (Italics added.) It is thus apparent that under defendant's own organizational set-up plaintiffs exercised "none of the sovereignty of the state."

The fact that plaintiffs may have been officers of the Authority does not bring them within the purview of section 16 for they were found upon substantial evidence not to be officers of the state for they neither had nor exercised any of the sovereign power of the state or of any political subdivision thereof within the meaning of said section. Whatever may be the correct characterization to apply to the positions held by plaintiffs with the Authority, it is indisputable that they held it by reason of a contract defining their duties, fixing their compensation and determining the period of their employment. One so employed is not an officer of the state; he is the employee of the person or organization employing him, although the person may be a public officer and the organization may be engaged in public work.

■ There is no merit in the Authority's argument that the federal Public Housing Administration (PHA) is an indispensable party to this action. The argument ignores one decisive fact—the subject matter of the action, which is the Authority's breach of a contract to which PHA was not a party and in which it had no justiciable interest of any kind. By definition an indispensable party is one whose "absence will prevent the court from rendering an effective judgment *between the parties* or would seriously prejudice any party *before the court*," or whose interest "would be inequitably affected or jeopardized by a judgment rendered *between the parties*." (Code Civ. Proc., § 389; italics added.) PHA fits none of these three categories.

A judgment awarding the plaintiffs damages for the Authority's breach of its contract with them could and was effectively rendered without PHA's presence. There was no prejudice to any party before the court. The plaintiffs were not prejudiced by PHA's absence, and, of course, they are not complaining of its nonjoinder. Neither was the Authority prejudiced. It was not prevented by PHA's absence from availing itself of any and all evidence, arguments and defenses it desired to present. Nor has PHA any interest at all, let alone one that would be jeopardized by a judgment "between the parties." No support for joinder of PHA therefore can be found in the indispensable party provisions of section 389, Code of Civil Procedure.

*Peabody Seating Co.* v. *Superior Court*, 202 Cal.App.2d 537 [20 Cal.Rptr. 792], strongly supports the trial court's decision on this matter. In that case it was held that one who was not a party to the contract in suit was not an indispensable party, even though a contract it had with one of the parties to the action would be consequentially affected by a judgment adverse to its contractor. The interest, the court held, was only "consequential and economic" and therefore not the "legal interest" necessary to make one an indispensable party.

■ Defendant argues, however, that even if PHA was not an indispensable party it was nevertheless a conditionally necessary party under section 389, Code of Civil Procedure as amended in 1957. A "conditionally necessary party" is one who is not indispensable but whose joinder "would enable the court to determine *additional causes of action* arising out of the transaction or occurrence involved in the action." (Code Civ. Proc., § 389; italics added.) The Authority fails to point

out what "additional causes of action arising out of the transaction or occurrence involved" would be presented for determination if PHA were made a party. The "transaction or occurrence involved in the action" is the discharge of plaintiffs by the Authority from their employment contracts. No fact or circumstance is shown giving rise to any cause of action for or against PHA arising out of that transaction or occurrence. Furthermore, there is no showing of any prejudice to the defendant by the absence of PHA. The moving papers make no such showing.

The fact that PHA is in possession of and is operating the Authority's housing projects gives it no justiciable interest in this case. The contracts which formed the subject matter of this action were made with the *Authority,* a separate and distinct entity or legal person. That entity or person remains, and is the same as it was when the contracts were entered into, regardless of what changes there may be in its executive, administrative, governing board or personnel.

The Authority vainly argues that its supplementary retirement plan is invalid and that its inclusion in the contracts render them invalid on the theory that it constitutes a gift of public funds in violation of sections 31 and 32, article IV of the state Constitution. The trial court made a comprehensive finding on this problem which reads: "At the time the Holtzendorff and Rosien Employment Contracts were entered into the defendant Housing Authority maintained and continued thereafter to maintain a retirement plan for its employees under and by virtue of which it was granting, and at all times thereafter continued to grant, to other of its employees retirement benefits (consisting of so-called 'basic' and 'supplementary' benefits) under and by virtue of which such employees could retire after a specified period of continuous service upon attaining age 55; upon and after which retirement the defendant Housing Authority would pay or cause to be paid to such retired employee for the remainder of such employee's life a fixed monthly sum computed in proportion to the employee's term of service at a rate that had been and was fixed and determined by the defendant Housing Authority. Said retirement plan entered into and became a part of the Holtzendorff Employment Contract and also of the Rosien Employment Contract. Said retirement plan was adopted by defendant Housing Authority before those employment contracts were entered into; and it superseded a substantially similar plan that had been adopted

by the defendant Housing Authority several years before and that had been continuously maintained by said defendant until superseded. Each of the plaintiffs was at all times a participant in each of the retirement plans adopted and maintained by the defendant Housing Authority. One of the conditions of said supplementary retirement plan was and is that, with the exception of vesting at normal retirement date or death, no account (benefits) thereunder should vest unless the participant, upon termination of employment executed an agreement with the defendant Authority that he or she will act when called upon by the Authority, for a period of five years as an independent consultant to and for the Authority. The retirement plan adopted and maintained by the defendant Housing Authority (including both basic and supplementary retirement benefits) was adopted and maintained in aid of a public purpose and, as applied to the plaintiffs and included in their respective employment contracts, was supported by a valuable consideration. Said plan was not a gift of public funds or property and was not an attempt to make such a gift.''

It will be recalled that the compensation to be paid plaintiffs was the same retirement benefits as were granted to other employees. A retirement plan, including the supplementary benefits, was maintained for other employees at the time the employment contracts with plaintiffs were executed and at all times thereafter. At the time the supplementary plan was adopted, plaintiffs had pensionable status since they were and continuously had been participants in each of the retirement plans maintained by the Authority. And they were qualified to participate and did participate in all of the pension funds which were in effect during their employment. As a consideration of receiving the supplementary benefits an agreement was required that the employee would render services when called upon for a period of five years as a consultant to the Authority. The allowance of supplementary benefits was, therefore, not based on past services but upon future services to be rendered after the supplementary plan was adopted. It is settled in California that a pension or retirement plan for public employees is not a gratuity or gift. '' [P]ension provisions do not provide for a gratuity but 'become a part of the contemplated compensation for those services and so in a sense become a part of the contract of employment itself . . . the right to a pension becomes a vested one upon acceptance of employment by an applicant.' . . .'' (*Brophy* v.

*Employees Retirement System,* 71 Cal.App.2d 455, 458 [162 P.2d 939]; *Kern* v. *City of Long Beach,* 29 Cal.2d 848, 855 [179 P.2d 799]; *Dryden* v. *Board of Pension Comrs.,* 6 Cal.2d 575, 579 [59 P.2d 104].) "A pension is a gratuity only where it is granted for services previously rendered which at the time they were rendered gave rise to no legal obligation." (*O'Dea* v. *Cook,* 176 Cal. 659, 661 [169 P. 366], quoted with approval in *Sweesy* v. *Los Angeles etc. Retirement Board,* 17 Cal.2d 356, 359, 360 [110 P.2d 37], and *Riggs* v. *District Retirement Board,* 21 Cal.2d 382, 385 [132 P.2d 1].) The converse of this proposition is, of course, that if the services did give rise to a legal obligation at the time they were rendered a later pension increase in an existing pension will not be held a gift. Thus, persons having a pensionable status are entitled to receive any increase of benefits which may be provided. (*Sweesy* v. *Los Angeles etc. Retirement Board, supra.*)

At the time the supplementary plan became effective a retirement system was in operation. The supplementary plan added to and increased the benefits of the existing system. Plaintiffs had pensionable status under that system. They were employees when the supplementary plan went into effect and it became a part of their contracts of employment and as such a part of their compensation for services thereafter to be rendered. So, they were entitled to any increase in benefits that might be put into effect. That increase is not a gift. The case clearly comes within the doctrine of the *Sweesy* case. It is thus clear that the supplementary retirement plan does not violate the constitutional provisions which prohibit the gift of public funds, and its inclusion in the contracts does not render them invalid.

 The Authority argues that the rescission of the employment contracts between it and plaintiffs, and the execution of the new contracts here under review at an increased salary amounted to a gift of public funds in violation of sections 31 and 32 of article IV of our Constitution. The court, however, found against defendant on this aspect of the case. The court found that the Holtzendorff contract recited that he had continuously and satisfactorily served the Authority since February 1941 under written agreements for various fixed periods, and that in order to assure the Authority of his continued services and in order to protect the Authority's investment in his long and valuable training and experience, it was determined to be necessary and in the best interest of the Authority to assure itself of the continued

services of Holtzendorff by entering into another written agreement for a further fixed period. A similar finding was made with respect to Miss Rosien. The court further found that the contracts of plaintiffs recited that both the Authority and the employee agreed that the existing contracts should be rescinded and new employment contracts entered into.

The court also found: ''Each of those contracts was supported by a valuable consideration moving respectively from each of the parties thereto to the other.''

Finally, the court found on this point: ''The Holtzendorff and Rosien Employment Contracts were, and each of them was, entered into in aid of a public purpose, and there was a valuable consideration for each of the contracts and for the promise and agreement of the defendant Housing Authority to pay the compensation provided for in and by said contracts. Neither of the contracts, nor any of the compensation promised and agreed to be paid or given under them, was or constituted or provided for any gift of public funds or property.''

In this connection it should be noted that, as between the contracting parties, the recitals in the contracts are conclusively presumed to be true. (Code Civ. Proc., § 1962, subd. 2; *Bowyer* v. *Burgess,* 54 Cal.2d 97, 100 [4 Cal.Rptr. 521, 351 P.2d 793].) Also, there was testimony that Holtzendorff had expressed to Mr. Beavers, then chairman of the Authority, a feeling of discouragement because of his indictment (of which he was acquitted) ; that his family was urging him to move; and that he was thinking of returning to his native state, Nebraska, where he was admitted to the Bar, and practice law. In response Mr. Beavers suggested, instead, new contracts that would assure the Authority of his and Miss Rosien's services, and also would carry them through to the time when they would be eligible to retire. As a result the new contracts were prepared and executed. It is reasonable that the chairman and other commissioners should look upon the retention of the services of plaintiffs for a substantial additional period as a benefit to the housing project because of their years in carrying out the administrative programs of the Authority. The experience they had gained was invaluable and it would, no doubt, have been difficult (maybe impossible) to replace them with adequately trained personnel. The Authority was therefore justified in extending the terms of their employment and increasing their compensation. Thus, the contracts were ''entered into in aid of a public purpose,''

as the court found, and were "supported by a valuable consideration," as the court also found. And there was no gift of public funds in violation of article IV, sections 31 and 32 involved in the rescission of the former contracts and the execution of the new. In this factual context, it is apparent that defendant's reliance on *California Highway Com.* v. *Riley*, 192 Cal. 97 [218 P. 579] is misplaced.

Defendant misconceives the provision of the employment contracts relative to its obligation to furnish each of the plaintiffs with an automobile. Counsel apparently reads the provision as though it dealt with the use of a publicly-owned vehicle for personal or private purposes. The court, however, set this matter at rest for it found: "The use of a passenger automobile by each of the plaintiffs was intended and agreed to be a use in connection with the work and business of defendant, Housing Authority, and accordingly neither plaintiff is entitled to recover for the loss of such use."

In any event, the contractual provision is severable from the other compensation provisions, and no recovery on account of it was allowed. Thus, it does not affect the validity of those provisions of the contract that were enforced.

 Defendant complains that the court erred in giving instruction number seven which reads: "You are instructed that the defendant in this case being a public corporation can act only through its governing body, that is, its commissioners. You are further instructed that any knowledge or information had or acquired by any one or more of its commissioners during and in the course and scope of his office as such commissioner, is in law deemed to be information or knowledge had by the defendant. Accordingly, the defendant could not properly or lawfully discharge the plaintiffs, or either of them, on account of any matter or thing known to the defendant at the time the defendant entered into the employment contract with the plaintiff concerned in such matter or thing."

There can be no question about the correctness of the first sentence of this instruction. (Health & Saf. Code, § 34275.)

As to the remaining portion of the instruction it should be noted that it is not relevant to either the payment to Miss Rosien for her unused vacation and sick leave, nor to Holtzendorff's testimony before the city council committee, since both of these events occurred *after* the execution of the employment contracts here in question. Furthermore, the

Rosien transaction was authorized by a resolution adopted by the governing board.

This leaves the installation and operation of the monitoring system as the only incident to which the instruction is relevant. In the context of that incident the instruction appears to be entirely in order. It simply states, in effect, that knowledge acquired by one of the commissioners ''during and in the course and scope of his office as such commissioner, is in law deemed to be'' the knowledge of the Authority. The reason a commissioner's knowledge is imputed to the governing board is that it is his duty to communicate to it any information he possesses that is material to the operation and protection of the business in which it is engaged. It is, therefore, fair to assume that he has done so (*McKenney* v. *Ellsworth,* 165 Cal. 326, 329 [132 P. 75] ; *Thompson* v. *Williams,* 190 Cal.App.2d 56, 60 [12 Cal.Rptr. 9]), provided there is no fraud or conflict of interest, and there is not anything suggested in the instant case which would have deterred chairman Beavers from advising the other board members that Holtzendorff had installed a monitoring system and the reasons therefor. Here we have a public corporation with five directors or commissioners operating a low rent housing venture. There is no reason why the rationale of imputed knowledge should not be just as applicable to the commissioners which run this public corporation as to the directors of a private corporation which is engaged in operating a housing project. Although defendant disputes this proposition, it cites no cases in support of its position.

In this connection, it should be pointed out that the question is not one of *binding* the principal by the knowledge of the agent who has no authority to act in the premises. Here the commissioner is, *inter alia,* a conduit for the transmission to the governing board of information acquired in the course and scope of his position and which is germane to the common responsibility of all the commissioners. It is a reasonable assumption that he will, as he should, communicate the information so acquired to the entire board. This is true even though he may be without authority to act individually or to bind the governing board in respect to the subject matter. Whatever binding effect is brought about results from the *board's action,* which must be considered to have been taken with the imputed knowledge of the facts learned by its member.

Thus, the information acquired by chairman Beavers from Holtzendorff that a monitoring system had been installed was

imputed to the board (and it is likely, in view of its significance in the operation of the business, to have been conveyed to the full membership of the board by the chairman) so that when the board executed Holtzendorff's new contract of employment on April 19, 1961, it knew about and approved his action in installing this equipment. Hence, he could not be discharged for what he had done in this respect prior to the execution of the latest contract. Thus, the instruction was proper.

Defendant has raised some additional points but they are not of sufficient significance to justify further extending the opinion on this appeal for they could not possibly affect the outcome of the judgment.

The judgment in favor of plaintiffs must be affirmed.

### Holtzendorff's Cross-Appeal

By its cross-complaint the Housing Authority seeks to recover money paid to Holtzendorff to reimburse him for funds expended by him for attorneys' fees and expenses in his defense in the criminal case of *People* v. *Holtzendorff*. From a judgment in favor of the Housing Authority in the amount of $38,442.61,[9] Holtzendorff has appealed.

In the interest of accuracy and completeness we quote the essential findings of fact and conclusions of law:[10]

*The Findings:*

"On December 4, 1957, Holtzendorff was indicted by the Grand Jury on 21 counts of embezzlement of public moneys in violation of Section 424, subdivision 2 of the Penal Code, and 21 counts for the same felony in violation of Section 504 of said Code, and for 10 counts for falsification of public records in violation of Section 424, subdivision 3 of said Code. All of said counts arose out of alleged orders and directions given by Holtzendorff to subordinates to use property and services of employees of the Housing Authority and the alleged use of such property and service pursuant to said orders and directions during the period from February 20, 1953, to March 31,

[9]The judgment is made up of two items: (1) $36,537.17, the amount of reimbursement paid out to Holtzendorff by the Housing Authority and (2) interest thereon at 7 percent from May 11, 1964, the date of demand, to the date of the entry of judgment.

[10]During the course of the main trial the parties stipulated that the court, sitting without a jury, should determine the issues raised by the cross-complaint and the answer thereto, upon the evidence admitted at the main trial and upon the pleadings and evidence admitted in the case of *People.* v. *Holtzendorff*, No. SC 197276, in the superior court. The parties later stipulated that the court could also consider the employment contract of Holtzendorff dated December 2, 1949.

1953, in support of Mayor Bowron's campaign for re-election as Mayor of the City of Los Angeles. Holtzendorff made a motion under Section 995 of the Penal Code to set aside the indictment, which was granted. Appeal was taken and the District Court of Appeal in the case of *People* v. *Holtzendorff,* 177 Cal.App.2d 788 [2 Cal.Rptr. 676], on February 15, 1960, reversed the order as to all counts charging a violation of said Section 504 and affirmed as to all other counts. On November 14, 1960, the defendant was found not guilty on the counts charging a violation of said Section 504.

"III. On November 29, 1960, Holtzendorff presented to the Commissioners of the Housing Authority a claim for reimbursement of legal fees and expenses incurred by him during the period from December 4, 1957, through November 14, 1960, in connection with his defense in the case of *People* v. *Holtzendorff,* in the amount of $36,537.17. Said claim was verified by Holtzendorff in which he certified that the 'Defense of the above action (referring to the criminal action of *People* v. *Holtzendorff*), arose directly from activities alleged to have been committed by the Executive Director in the administration of the affairs of the Housing Authority of the City of Los Angeles, California.' At an adjourned regular meeting of the Commissioners on said date, said claim was approved as submitted and payment was · authorized. On November 30, 1960, the Housing Authority paid Holtzendorff the amount of said claim.

"IV. On January 29, 1959, the chairman of the Commission requested a legal opinion from the City Attorney of the City of Los Angeles as to whether the Commissioners of the Housing Authority '. . . as a matter of law, have the legal power to authorize and approve the payment, or reimbursement of, attorney fees, court costs, judgment or other legal expenses incurred or realized by any Commissioner, officer or employee of said Housing Authority in defending any legal action not involving moral turpitude (or if involving moral turpitude, results in a favorable judgment for the defendant), civil or criminal, brought against said Commissioners, officers, or employees, in their official capacity or as individuals, because of any collective action taken by them in the administration of the affairs of the Housing Authority . . .' The City Attorney of the City of Los Angeles on February 13, 1959, rendered an opinion that the Commissioners had the legal power to pay or reimburse for such expenses if the Housing Authority 'by proper action makes a provision as a general

rule and regulation for the payment of such items as a valid obligation of the Authority.' Said opinion was in part based on Section 1956 of the Government Code which among other things authorized any public corporation to insure its officers and agents against any liability 'for injuries or damages resulting from their negligence or carelessness during the course of their service or employment.'

"V. On February 17, 1959, the Housing Authority adopted Resolution No. 2602 purporting to adopt such a general rule and regulation. Said resolution contains several recitals. One is to the effect that the Commissioners, officers, employees and agents of the Housing Authority are not now protected against personal liability resulting from their activities in the administration of the affairs of said Authority. Another recital is to the effect that said persons or some of them have in the past incurred personal expenses and potential liability resulting from such activities. Another recital determines it to be in the best interests of the Housing Authority that said persons be protected from such personal liability and that the cost or expense of the Housing Authority in assuming or insuring same is for a public purpose.

"VI. That said resolution of the Housing Authority stated in pertinent part that the Housing Authority 'hereby assumes, as a valid legal obligation, any and all liability incurred by its Commissioners, officers, employees and agents . . . as the direct result of acts performed in good faith within the scope of their official authority or ''under the color of office'' including errors in judgment, but excluding wilful misconduct or acts committed with malice', subject to certain conditions. One of said conditions is that the past obligations thereby assumed must have been incurred or discovered during the three years immediately prior to the adoption of said resolution. Another condition is that the obligations incurred prior to the adoption of said resolution shall be paid by the Housing Authority as a self-insurer, from the Operation Reserve Fund and obligations incurred after the adoption of the resolution, were authorized to be covered by insurance through a private insurance carrier and if full coverage is not available, then the part not so covered is authorized to be paid by the Housing Authority as a self-insurer from the Operation Reserve Fund.

"VII. Said $36,537.17 paid by the Housing Authority to Holtzendorff on November 30, 1960, was paid by the Housing Authority pursuant to the provisions of said resolution.

"VIII. Pursuant to the stipulation of the parties at the time of the pretrial conference and referred to in the pretrial conference order, the cross complaint was deemed filed on May 11, 1964.

"IX. That the payment to Holtzendorff by the Housing Authority was made through mistake and inadvertence and that said payment constituted a gift of public funds and as such was void, illegal and unconstitutional.

"X. That the payment of November 30, 1960 was for a private and not for a public purpose. That the acts or offenses charged in the indictment in *People* v. *Holtzendorff*, were personal acts of Holtzendorff and not connected with his official duties. The paying of said legal expenses had no relation to a proper legislative purpose or any purpose of the Housing Authority authorized by any law.

"XI. It is true that Holtzendorff was found not guilty. The Commissioners had no authority to authorize said payment and Holtzendorff had no authority to receive it. At the time he received said payment, Holtzendorff was an agent of the Housing Authority.

"XII. Holtzendorff was required to repay this money upon demand; the filing of the cross complaint constituted such a demand which was the only demand made by cross complainant.

"XIII. Holtzendorff has failed to show any laches on the part of the Housing Authority in the filing of said cross complaint which resulted in any prejudice to Holtzendorff."

*Conclusions of Law*:

"(1) The payment of $36,537.17 by the Housing Authority to Holtzendorff on November 30, 1960 was for a private and not for a public purpose and constituted a void, illegal and unconstitutional gift of public funds.

". . . . . . . . . . . .

"(3) The claim of the Housing Authority is not barred by the statute of limitations as set forth in Section 338, subdivision 4 or Section 339, subdivision 1 of the California Code of Civil Procedure.

"(4) The claim of the Housing Authority is not barred by reason of laches.

"(5) The power of the Housing Authority as set forth in Sections 34311 to 34318, inclusive, of the California Health and Safety Code does not permit the use of its property or money in conducting any political campaign for whatever its purpose.

"(6) There is no reasonable basis upon which the Commissioners could determine that the Housing Authority could assume the legal expenses of its officers and agents in defending a criminal charge amounting to a felony not growing out of the performance of his legal duties.

"(7) The Commissioners had no authority to authorize the payment of Holtzendorff's legal fees for the defense of his personal criminal indictment; Holtzendorff had no authority to receive the said money; at the time Holtzendorff received the money, he was an agent of the Housing Authority, and under such circumstances the law implies a promise to repay the money to his principle [sic] on demand.

"(8) The filing of the cross complaint constituted a demand for the return of the money advanced to Holtzendorff.''

■■■■ In seeking a reversal Holtzendorff argues that the payment was voluntary and intentional; that to warrant recovery on the theory of mistake it must be one of fact and not of law. In making this argument he overlooks the significant character of public funds—that they are trust funds. The significance of this factor is pointed up by the court in *Aebli* v. *Board of Education,* 62 Cal.App.2d 706 [145 P.2d 601] (hear. den.) where the court noted (p. 725) that ''. . . generally speaking, where money is paid out by mistake by the state or an agency of government (whether by mistake of fact or mistake of law) it can be recovered back in many instances where, if paid out by an individual or private corporation it could not be. [Accord: *People* v. *Union Oil Co.,* 48 Cal.2d 476, 483 [310 P.2d 409].]

'' 'The reason for this, and the theory underlying it, is that the funds paid out are public funds,—trust funds,—and not the property of an individual who can deal with them as he pleases.' ''

In *Aebli,* the court cited *Norfolk County* v. *Cook,* 211 Mass. 390 [97 N.E. 778], where a public employee had been paid public funds to which, under a correct interpretation of the law in question, he was not entitled. The county brought an action to recover the funds so paid. The employee invoked the rule that money voluntarily paid under no mistake as to the facts could not be recovered. The *Aebli* court quoted with approval the following from the decision of the Massachusett's court rejecting the public employee's contention: '' 'The rule is of very general application between individuals. . . . But public officers are dealing with money which is

not their own and over which their powers are subject to well known limitations. They can pay when the law requires or permits, and they cannot pay when it forbids. So far as they act within their powers the public, whose agents they are, must abide the consequences. But when they act beyond their powers they do not bind their principals. The payment of this money in this case was not the act of the county, but simply the unauthorized act of a public officer. It was not the voluntary payment of money by the owner, but by one who had no beneficial interest in it and who was not authorized by the principal to make the payment. Manifestly one of the chief conditions for the application of the rule is wanting. To such a condition of things the rule does not apply; and such is the great weight of authority.' '' (62 Cal.App.2d 706, 726-727.)[11]

The next question is whether the money paid by the Housing Authority to Holtzendorff was for a public purpose. The Housing Authority in adopting Resolution 2602 exceeded the limitations of section 1956 of the Government Code which limits public corporations in insuring its agents and employees ''for injuries or damages resulting from their negligence or carelessness during the course of their service or employment.'' This language could mean nothing else but within the scope of the legal duties of such agent or employee. The power of the Housing Authority as set forth in sections 34311 to 34318, inclusive, of the Health and Safety Code does not permit the use of its property or money in conducting any political campaign for whatever its purpose.

It is true that the courts have held that the determination of what constitutes a public purpose is primarily a matter for legislative discretion and such discretion will not be disturbed so long as it has a reasonable basis (*County of Alameda* v. *Janssen,* 16 Cal.2d 276, 281 [106 P.2d 11, 130 A.L.R. 1141].) But in the case at bar there is no reasonable basis upon which the commissioners could determine that the Housing Authority could assume the legal expense of its officers and agents in defending a criminal charge amounting to a felony not growing out of the performance of his legal duties. The paying of such legal expense had no relation to a proper legislative purpose or any purpose of the Housing Authority authorized by any law.

---

[11]See additional authorities cited at the bottom of page 727 and top of page 728 to the effect that ''money paid out by a governmental agency under either mistake of fact or law may be recovered from the payee.''

The next question is whether or not the acts for which Holtzendorff was indicted were for acts within the scope of his legal duties or were they his personal acts unconnected with his official duties. The Court of Appeal in the case of *People* v. *Holtzendorff*, 177 Cal.App.2d 788 at p. 806 [2 Cal.Rptr. 676], makes it clear that the acts charged in the indictment against Holtzendorff were his personal acts unconnected with his official duties. The court stated: "It was the Authority's money that was appropriated and it went for services already rendered, but not to the Authority, nor for any use or purpose in the lawful execution of defendant's trust. . . ."

## Statute of Limitations

Holtzendorff argues that a cause of action for restitution of money illegally exacted is one for money had and received and that the two-year limitation period of section 339, Code of Civil Procedure, is applicable. This does not represent the law in the factual context of the case at bench as shown by the decision in *People* v. *Union Oil Co.*, 48 Cal.2d 476 [310 P.2d 409]. That was an action by the People to recover certain monies improperly paid to the oil company as interest on certain overpayments of franchise tax refunded to defendant for the income years 1942-1944. The court stated (p. 483): "Clearly a mistake of law was involved. Seeking relief from such mistake, plaintiff filed its complaint setting forth two causes of action. In the first it alleged, in substance, its improper payment of interest on the overpayments made by defendant for the period subsequent to July 9, 1947; the enactment of the 1947 amendment prohibiting such interest payments to defendant; the amount of interest properly allocable to defendant on its overpayments and the erroneous allowance made by the commissioner; and its demand upon defendant for repayment of the alleged improper interest payments—allegations sufficient to show plaintiff's theory of relief 'on the ground of mistake.' In the second cause of action, plaintiff pleaded the common count of money had and received, but this cause of action was based entirely upon the allegations for the first cause of action.

"Defendant argues that while said mistake of law may have caused the improper interest payments, such mistake is merely incidental to plaintiff's cause of action as one for money had and received, that no other ground of relief was available to plaintiff, and that therefore the two-year statute of limitations applies. . . . But here the mistake of law is not a mere inci-

dent to plaintiff's right to recovery. Rather it is the very basis or gravamen of plaintiff's action and if it were not for such mistake of law by the administrative officers, the cause of action would not have accrued. [Citation.] Accordingly, the applicable statute is the three-year statute governing an action for relief on the ground of mistake. (Code Civ. Proc., § 338, subd. 4.)''

It is thus established that the applicable statute of limitation is the three-year statute in section 338, subdivision 4, Code of Civil Procedure. The payment here in question was made on November 30, 1960, the original complaint was filed on April 18, 1963. Therefore the cross-complaint was filed within the three-year period of limitations and recovery is not barred. (*Jones* v. *Mortimer,* 28 Cal.2d 627 [170 P.2d 893]; *Goodwin* v. *Alston,* 130 Cal.App.2d 664 [280 P.2d 34].)

 It is true that the cross-complaint was deemed filed on May 11, 1964. This was, of course, more than three years after the payment was made to Holtzendorff. It is upon this basis that he argues that the three-year statute has run.

The principle that governs here is stated in *Jones, supra* (p. 633), in this language: ''The statute of limitations is not available to plaintiff as to defendant's counterclaim if the period has not run on it at the time of commencement of plaintiff's action even though it has run when the counterclaim is pleaded. [Citations.] . . .'' The principle of *Jones* was applied in *Whittier* v. *Visscher,* 189 Cal. 450, 454, 456 [209 P. 23], where the cross demand was set up by cross-complaint. The court stated: ''We will consider next the cross-complaint. . . .

''. . . . . . . . . . . .

''It is next contended that the claim in this case is barred by the statute of limitations. It is conceded that it was not so barred when the original action was begun, and the authorities in this state seem to be agreed that if the right of action relied on was alive at the commencement of the suit the statute does not run against it, when, as in this case, the full statutory period has expired thereafter during the pendency of the action and before the claim is pleaded as a cross-complaint. [Citations.] . . .''

Under California statutes there is a broad area in which there is no true distinction between a cross-complaint and a counterclaim. A cross-complaint may be filed only when the affirmative relief sought by defendant constitutes a claim ''relating to or depending upon the contract, transaction,

matter, happening or accident upon which the action is brought.'' (Code Civ. Proc., § 442.) Since 1927 there has been no comparable limitation upon the counterclaim, which merely need tend to diminish or defeat plaintiff's recovery and must exist in favor of a defendant and against a plaintiff between whom a several judgment might be had in the action. (*Case* v. *Kadota Fig Assn.*, 35 Cal.2d 596, 604 [220 P.2d 912]; Code Civ. Proc., § 438.) ''If the defendant's claim tends to diminish or defeat the plaintiff's recovery and also comes within the transaction or property clauses, it meets the tests of both C.C.P. 438 and C.C.P. 442. Under these statutes it may be either a counterclaim or cross-complaint.'' (2 Witkin, Cal. Procedure (1954) § 571.) ''The true nature of the pleading will be determined from its allegations, regardless of its designation by the pleader as cross-complaint or counterclaim.'' (*Taliaferro* v. *Taliaferro*, 154 Cal.App.2d 495, 499 [316 P.2d 393].) In *Case, supra,* the court stated: ''Therefore, regardless of the caption and introduction of Kadota's pleading, it may be treated as a counterclaim, if it satisfies the statutory requirements for a pleading of that kind.'' (P. 604.) The cross-complaint of the Housing Authority clearly meets all of the requirements of a counterclaim and may properly be so treated for the purpose of determining whether the statute of limitations has run against the Authority's cross-demand. Applying the principle of *Jones* and *Whittier,* it is apparent that the statute of limitations had not run on the Housing Authority's cross-demand.

The judgment on the cross-complaint in favor of the Housing Authority must be affirmed.

Each judgment is affirmed.

Files, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied May 18, 1967, and the petition of defendant and appellant and cross-complainant and respondent for a hearing by the Supreme Court was denied June 28, 1967.